WENDY McCARTNEY,         :
       Plaintiff     :    NO.: 1:09-CV-01817
                  :
v.                :    (JUDGE CONNER)
                  :    (MAGISTRATE JUDGE PRINCE)
PENNSYLVANIA STATE POLICE,  :
JEFFREY MILLER, DANIEL HAWK,  :
DENNIS SMOLKO, EARL KILLION,  :
CHARLES STROBERT, THOMAS   :
MANION, THOMAS BUTLER, and   :
PATRICK B. GEBHART,        :
       Defendants    :
                  :

# REPORT AND RECOMMENDATION

Pursuant to an Order entered on January 5, 2011 (Doc. 56), Honorable Christopher C. Conner referred defendants' pending motion for summary judgment (Doc. 36) to the undersigned Magistrate Judge for the purpose of preparing a Report and Recommendation.

## I. Background

This case involves claims against individual officers of the Pennsylvania State Police (PSP) and the PSP itself, brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and, via the remedial statute 42 U.S.C. § 1983, the Equal Protection Clause of the Fourteenth Amendment and a theory of retaliation under the First Amendment.

### (A) Facts of the case

For the most part, the events relevant to this case took place between April 2005 and December 2008, when plaintiff Wendy McCartney was working at the Altoona District Office of the Pennsylvania Bureau of Liquor Control and Enforcement (BLCE), a

division of the PSP. But there are many characters in this story, and before diving in, some introductions are in order.

## (1) The parties

### (a) Wendy McCartney

McCartney is a woman who currently lives in Duncansville, Pennsylvania. (Doc. 37, ¶ 10; Doc. 50, ¶ 10.) In 2001, she began working for the PSP as a Liquor Enforcement Officer (LEO) in the Philadelphia office of the BLCE. (Doc. 37, ¶ 11; Doc. 50, ¶ 11.) She transferred to the Pittsburgh office in 2003. (Doc. 37, ¶ 14; Doc. 50, ¶ 14.) While in Pittsburgh, McCartney worked with defendant Dennis Smolko; other women, including female LEOs, were in the office. (Doc. 37, ¶ 15; Doc. 50, ¶ 15.) She had been inside Smolko's office while she was stationed there, but she never filed any type of complaint against PSP or Smolko during her time in Pittsburgh. (Doc. 37, ¶ 15; Doc. 50, ¶ 15.)

On or about April 25, 2005, McCartney transferred from the Pittsburgh District Office to the Altoona District Office of the BLCE. (Doc. 37, ¶ 22; Doc. 50, ¶ 22.) Shortly after she moved to Altoona, she was in a car accident that led to being out of work on medical leave "for a considerable part of 2005." (McCartney Dep. 39:13–18, May 19, 2010, Doc. 38-2, at 32.) Records indicate that she had four extended periods of absence, although the records do not indicate the reason for absence: April 28, 2005, to July 22, 2005 (62 days); September 1, 2005, to January 3, 2006 (89 days); September 24, 2007, to December 28, 2007 (70 days); and May 5, 2008, to July 11, 2008 (50 days). (McCartney Dep. 181:4–186:14, Doc. 38-3, at 14–19; Overview of Absences for Wendy R. McCartney, Doc. 38-6, at 25–34.)[1]

---

[1] Plaintiff explained the absences without reference to the record. (Doc. 50, ¶ 27.)

At some point, McCartney requested an Americans with Disabilities Act (ADA) accommodation, but was denied: "I was informed that the department could not accommodate me," she said. (McCartney Dep. 16:17–20, Doc. 38-2, at 16.) She retired in December 2008 because of back and foot problems. (Doc. 37, ¶ 1; Doc. 50, ¶ 1; McCartney Dep. 16:15–20, Doc. 38-2, at 16.) Her disability retirement pension left her with income that was "a little less than half of what [she] would be bringing home if [she] had been working." (McCartney Dep. 15:7–16, Doc. 38-2, at 15.) Since leaving the PSP, McCartney has neither worked nor sought employment. (McCartney Dep. 16:21–17:1, Doc. 38-2, at 16–17; *id.* 169:8–12, Doc. 38-3, at 9.)

### (b) Daniel Hawk

Defendant Daniel Hawk was a sergeant in the PSP and was the District Office Commander (DOC) in the Altoona District from February 13, 2006, until his retirement on January 12, 2007. (Hawk Decl. ¶ 1, Aug. 8, 2010, Doc. 38-6, at 10; McCartney Dep. 96:21–97:5, Doc. 38-2, at 59–60; *id.* 134:9–14, Doc. 38-2, at 89.) When he transferred to Altoona, he had a meeting with all office staff, including McCartney, and told staff that profanity would not be tolerated.[2] (Hawk Decl. ¶ 4, Doc. 38-6, at 11.) Hawk had no contact with McCartney after he retired.[3] (Hawk Decl. ¶ 1, Doc. 38-6, at 10.)

### (c) Dennis Smolko

As of August 25, 2010, defendant Dennis Smolko was an Enforcement Officer 3 (EO3) with the BLCE and has held that position until the present time. (Smolko Decl. ¶ 1,

---

[2]Plaintiff denied without reference to the record. (Doc. 50, ¶ 29.)

[3]Plaintiff rightly pointed out that defendants' citation in their statement of material facts is to McCartney Dep. 133–34, 284, which does not support the statement in question. (Doc. 50, ¶ 30; Doc. 37, ¶ 30.)

Aug. 25, 2010, Doc. 38-5, at 60.) Smolko stated that he was McCartney's direct supervisor from March 2004 to July 2004 in the Pittsburgh District Office. (*Id.* ¶ 2.) McCartney states that she has no memory of him being her supervisor: "I don't recall. I don't really know," she said. (McCartney Dep. 25:7–16, Doc. 48-2, at 6.) She only remembered EO3 Hupp. (*Id.*)

### (d) Earl Killion

As of August 2010, defendant Earl Killion was an LEO for the PSP BLCE who worked at the Altoona office. (Doc. 37, ¶ 33; Doc. 50, ¶ 33.) For a time in 2006 and 2007, he was an Acting EO3. (*Ids.*) He has worked at the Altoona office from 1996 until the present.[4] (Killion Decl. ¶ 1, Aug. 2010, Doc. 38-6, at 37.)

### (e) Charles Strobert

As of August 2010, defendant Charles Strobert was a sergeant in the PSP. (Strobert Decl. ¶ 1, Aug. 2010, Doc. 38-6, at 59.) Until January 8, 2006, he was the DOC in the Altoona district; he was then transferred to the Lewistown PSP barracks.[5] (*Id.*)

### (f) Thomas Butler

As of August 25, 2010, defendant Thomas Butler was a captain with the PSP in the BLCE and was then the Director of Operations. (Butler Decl. ¶ 1, Aug. 25, 2010, Doc. 38-7, at 7; McCartney Dep. 380:7–15, Doc. 38-4, at 69.) From January to March 2009,

---

[4]Plaintiff denied without reference to the record. (Doc. 50, ¶ 33.)

[5]Plaintiff "neither admitted nor denied" these statements and made no reference to the record. (Doc. 50, ¶ 34.)

Butler worked in Harrisburg as the Director of Administration for the BLCE. (*Ids.*) While there, he was also the Equal Employment Opportunity (EEO) Liaison.[6] (*Ids.*)

As EEO Liaison, Butler's job was to investigate claims of discrimination and harassment filed by BLCE employees. (Bulter Decl. ¶ 1, Doc. 38-7, at 7.) He interviewed people who might have knowledge of the events in question and reviewed relevant documents. (*Id.*) After completing an investigation, Butler would submit his findings to the Director of the Department EEO Office. (*Id.*) During the time that Butler was EEO Liaison, the Director was Lt. M.L. Henry. (*Id.*) Lieutenant Henry was responsible for determining whether any violations of PSP policies regarding discrimination had actually occurred, and he would direct the appropriate response. (*Id.*)

### (g) Patrick B. Gebhart

As of August 2010, defendant Patrick B. Gebhart was a captain in the PSP BLCE and was the Director of Administration for the BLCE. (Gebhart Decl. ¶¶ 1–2, Aug. 2010, Doc. 38-8, at 7–8.) He began with BLCE in March 2007 as Director of Operations. (*Id.*) He worked in Harrisburg at all times he was with the BLCE. (*Id.*; McCartney Dep. 403:11–13, Doc. 38-4, at 83 (stating that Gebhart was in Harrisburg).) Before March 2007, he had had no contact with McCartney. (Gebhart Decl. ¶¶ 1–2, Aug. 2010, Doc. 38-8, at 7–8.) His only involvement with her is that he signed the reprimand that she got for her handling of an investigation into the Mountain Top Sportsman Assocation. (*Id.*) The letter had been prepared by others after an investigation by others. (*Id.* ("As the new Director of Operations, the reprimand went out under my signature; however, I had

---

[6]Plaintiff denied these statements without reference to the record. (Doc. 50, ¶ 35.)

absolutely no role in the investigation or determination of discipline.").).[7] He delivered that letter to McCartney in Altoona. (*Id.*)


## (2) The February 2006 EEO complaint

On February 9, 2006, McCartney submitted an internal EEO complaint to Butler. (Doc. 37, ¶ 43; Doc. 50, ¶ 43; Wendy R. Macknair, Complaint Regarding Hostile Work Environment (Feb. 9, 2006), Doc. 38-8, at 16 [hereinafter "EEO Complaint"].) The complaint alleged that McCartney was subject to a hostile work environment and disparate treatment (Doc. 37, ¶ 44; Doc. 50, ¶ 44), and included numerous allegations against Manion, Smolko, Strobert, and Killion, as well as allegations that a number of officers were using offensive, profane language. (*See* Doc. 37, ¶¶ 46a–77; Doc. 50, ¶¶ 46a–77 (overviewing the contents of the EEO complaint).)


### (a) Allegations against Manion

McCartney believed that there "may be a potential for [Manion] to create a hostile work environment" because another female employee said that Manion "mistreated" her and because of a male LEO who, in 2002, was "constantly complaining about how [Manion] mistreated him." (Doc. 37, ¶ 45a; Doc. 50, ¶ 45a; EEO Complaint ¶¶ 4–6, Doc. 38-8, at 17.) The EEO complaint also alleges that in May 2005, Manion came to her residence uninvited, pulling into her driveway and turning around; and in August 2005, Manion watched McCartney in the parking lot and then told her so, and said that one

---

[7]Plaintiff disputed with reference to the reprimand itself, stating that "[w]hen Gebhart signed the letter under the 'From' section, [that] signifie[d] that he read and agreed with the correspondence." (Doc. 50, ¶ 38; Letter from Capt. Patrick B. Gebhart, Dir., Operations Div., to Wendy R. McCartney, LEO (May 31, 2007), Doc. 48-3, at 1.)

Administrative Law Judge Thau would like her because she is female. (EEO Complaint ¶¶ 8–10, Doc. 38-8, at 17–18.)

(b) Allegations against Smolko

In August 2005, Smolko told McCartney that the squad room was a "big male dormitory" and in the past, foul language was used and farting "occurred." (Doc. 37, ¶ 46a; Doc. 50, ¶ 46a; EEO Complaint ¶ 12, Doc. 38-8, at 18.) He told her that he and the other male officers felt "that since there is a 'girl' around, they can't do that and have to watch what they say and do around [her]." (Doc. 37, ¶ 46b; Doc. 50, ¶ 46b; EEO Complaint ¶ 12, Doc. 38-8, at 18.) The February 2006 EEO complaint was the first time that McCartney complained about these comments of Smolko's. (McCartney Dep. 214:18–215:2, Doc. 38-3, at 40–41.)

On January 10, 2006,[8] Smolko convened a meeting in the DOC's office and invited "all of the other" LEOs. (EEO Complaint ¶ 23, Doc. 38-8, at 20–21.) He told "these male [LEOs] (Burn's [sic], Butler, maybe Salmon, not Coble or Bell, etc.)" about certain administrative changes being made.[9] (*Id.*)

On January 18, 2006, Smolko invited Burns and other LEOs to a sports bar to watch a football game on Sunday, but he did not invite McCartney, even though she expressed interest. (Doc. 37, ¶ 46d; Doc. 50, ¶ 46d; EEO Complaint ¶ 24, Doc. 38-8, at

---

[8]At this time, Smolko may have been Acting DOC. (EEO Complaint ¶ 12, Doc. 38-8, at 18.)

[9]Plaintiff stated without an accurate supporting citation that Officers Coble and Bell were not in the meeting only because they were outside the office at that time. (Doc. 50, ¶ 46c.) However, McCartney testified: "I don't believe they were there that day, but I'm not sure why they weren't there in the office at that time." (McCartney Dep. 216:11–13, Doc. 38-3, at 42.)

7

21.) McCartney did not ask to be invited to the sports bar and did not know whether they actually went to the sports bar. (McCartney Dep. 217:5–10, Doc. 38-3, at 43.)

During an office meeting also on January 18, Smolko stated that the "girls," referring to the secretaries, wanted to say a few things. (Doc. 37, ¶ 46e; Doc. 50, ¶ 46e; EEO Complaint ¶ 25, Doc. 38-8, at 21.) McCartney has no evidence that other women complained to anyone about the "girl" comment. (Doc. 37, ¶ 60; Doc. 50, ¶ 60.) After the February 2006 EEO complaint was filed, McCartney could specifically identify no instance of Smolko using the word "girls" in the workplace. (Doc. 37, ¶ 56; Doc. 50, ¶ 56.)

During the same meeting, Smolko stated that cell phones were not to be used at the office; the next day, another LEO, Jeffrey Butler—a different person from Captain Butler—used his cell phone in the office, which Smolko witnessed but did not comment on. (Doc. 37, ¶ 46f; Doc. 50, ¶ 46f; EEO Complaint ¶ 27, Doc. 38-8, at 21–22.) Butler was calling Bell, who was on the road working and needed assistance with directions. (McCartney Dep. 219:3–10, 221:1–3, Doc. 38-3, at 45, 47.) McCartney admits that personal cell-phone usage was "excessive," as Smolko said it was. (Smolko Decl. ¶ 6, Doc. 38-5, at 61; Doc. 50, ¶ 62.) When Smolko "told all to try and limit cell phone usage," this was publicly announced at a staff meeting; Smolko was reiterating a policy that DOC Strobert had initiated. (Smolko Decl. ¶ 6, Doc. 38-5, at 61; Hawk Decl. ¶ 41, Doc. 38-6, at 19 (stating that Hawk never reprimanded McCartney for her use of a cell phone).)[10] McCartney offered the following testimony on this subject:

> A. I didn't see where any of the other officers were being questioned about [cell-phone usage]. So even if [Hawk] had been questioning them, he kept it from me, made it look like he wasn't.

---

[10]Plaintiff disputed with reference to "Defendants Exhibit 58 Plaintiff's notes titled Cell Phone Issues, page 2 & 3" and "Exhibit 5 Hawk's 05/17/06 email which questions Plaintiff's cell phone call while she is in the classroom" (see Doc. 50, ¶ 62), but neither of these exhibits are identifiable in the record.

Q. You don't know one way or the other whether he was reprimanding them or disciplining them or talking to them about cell phones; correct?

A. I do not know that for sure, but I can tell you that if he had been reprimanding them or disciplining them or questioning all of their calls, then I think the amount of calls would have went down. I would think that you wouldn't hear their cell phones ringing several times a day, every day, if they were being questioned every time that they had made a call.

Q. But again you don't know whether he did that or not? You have no facts or evidence of that?

A. No, I don't know.

. . . .

Q. Were you disciplined or counseled for using your cell phone?

A. I was questioned by Hawk for the use of my cell phone. After the rule of cell phone use is actually listed, Hawk lists it and says . . . you can use your cell phone during work ours, just limit it to you know short—like he said 15 or 20 minute calls. But then after I'm overheard receiving a phone call from my doctor's office, he questions it. And—

Q. Do you know whether he questioned other people, or do you not know?

A. I do not know.

(McCartney Dep. 111:5–23, Doc. 38-2, at 68; *id.* 311:17–312:6, Doc. 38-4, at 16–17.)

On January 23, 2006, McCartney was brought into Smolko's office and on the wall she saw a Polaroid photo of a man in a penis costume. (Doc. 37, ¶ 46g; Doc. 50, ¶ 46g; EEO Complaint ¶ 29, Doc. 38-8, at 22.) Smolko averred in his declaration that he had had this photo up while he was in his Pittsburgh office, and although McCartney had been in his office then, and also had visited his Altoona office many times while the photo was on display, she did not complain about the photo until February 2006. (Smolko Decl. ¶¶ 3–4, Aug. 25, 2010, Doc. 38-5, at 60–61; McCartney Dep. 45:21–24, Doc. 38-2, at 35 (confirming that the February 2006 complaint was the first complaint about the

photograph).) This Polaroid photo, about four by four inches in size, was on the wall of Smolko's Altoona office among other photos and documents. (McCartney Dep. 45:5–10, Doc. 38-2, at 35; Smolko Decl. ¶ 4, Doc. 38-5, at 61.) McCartney took the Polaroid from the wall, copied it, returned it to the wall, and submitted it to Captain Butler. (Doc. 37, ¶ 49; Doc. 50, ¶ 49.) As far as McCartney knew, after Butler's investigation, neither the penis photograph nor any other sexually inappropriate photographs were ever displayed in the workplace again. (McCartney Dep. 129:23–25, Doc. 38-2, at 85; *id.* 229:16–230:3, Doc. 38-3, at 55–56.)

At a staff meeting on January 30, 2006, Smolko reassigned work vehicles to the LEOs. (EEO Complaint ¶ 34, Doc. 38-8, at 23.) After being offered a choice between a Malibu and a Grand Am, McCartney got the Malibu, observing: "It appears to me that the males believe that having a Malibu is a big joke. I guess Wendy gets the joke of a car over the males getting the better cars." (*Id.*)

On February 1, 2006, Smolko said "fuck." (EEO Complaint ¶ 40, Doc. 38-8, at 24.) McCartney identified one subsequent instance (beyond the time frame of the EEO complaint) in which Smolko made a comment in her presence that was gender- or sexually inappropriate:

> A. Then we have of course the time that he [came] out of the office yelling f'ing Barney . . . [H]e blatantly just screamed it right in my ear practically . . . .
>
> . . . .
>
> Q. Did he direct that at you or did he just say it out loud?
>
> A. He said it out loud, of course. But I felt as if it was being directed at me.

(McCartney Dep. 233:8–20, Doc. 38-3, at 57.) Smolko identified the date as April 2008. (Smolko Decl. ¶ 11, Doc. 38-5, at 63.) McCartney had recorded it as Tuesday, April 15, 2008, at 3:15 pm. (McCartney Dep. 250:6–14, Doc. 38-3, at 66.) She noted that it initially

sounded as though he were talking to Mirabella, another LEO. (*Id.* 250:19–25.) Smolko apologized to McCartney for his comment. (McCartney Dep. 130:11–16, Doc. 38-2, at 86; Smolko Decl. ¶ 11, Doc. 38-5, at 63.) Concerning Smolko's apology, McCartney opined: "I think it was a show. He did that because he just wanted to be able to show me that he could still do whatever it was that he wanted to do. And as long as he apologized, he thought it was okay." (McCartney Dep. 233:24–234:3, Doc. 38-3, at 57–58.) She made no formal complaint to the Department regarding Smolko's comment. (Doc. 37, ¶ 55; Doc. 50, ¶ 55.) At the time that McCartney was deposed, she could recall no instance of Smolko using profanity after the February 2006 EEO complaint, other than the one instance on April 15, 2008. (McCartney Dep. 251:13–252:7, Doc. 38-3, at 67–68.) However, she did say: "I believe that there were other times that he had" used offensive language, but couldn't recall specific dates or times or words. (*Id.* 131:13–20, Doc. 38-2, at 87.) She also testified that LEO Jeffrey Butler used the "F" word frequently, although he did not say it to her; as far as she knew, Smolko never reprimanded him for cussing. (*Id.* 191:3–192:13, Doc. 48-6, at 48.)

### (c) Allegations against Strobert

On August 15, 2005, Strobert was discussing Deputy Commissioner Transue (who was fired and then rehired as the Deputy of Special Projects in Philadelphia) after having sent out an email with two attached news articles about Transue. (EEO Complaint ¶ 13, Doc. 38-8, at 18.) Strobert commented: "I'm gonna get fired and be rehired as a Commissioner. That's right; I'm not a female. I can't do that." (*Id.*) The first complaint that McCartney made about the Transue email and Strobert's comment was her EEO complaint. (McCartney Dep. 208:5–9, Doc. 38-3, at 36.)

On October 7, 2005, Strobert sent an email to various recipients, including McCartney, attached to which was a scan of a 1955 Good Housekeeping article entitled

"The Good Wife's Guide." (EEO Complaint ¶ 14–15, Doc. 38-8, at 18–19; Doc. 37, ¶ 64b; Doc. 50, ¶ 64b.) McCartney described the email as offensive. (*Ids.*) Strobert editorialized in his email: "Wow, what a difference 50 years makes. Hurray for liberation movements." (*Ids.*) McCartney interpreted his comment as sarcastic. (*Ids.*) Among the recipients of the email were several women, including a Linda Strobert. (Doc. 38-8, at 29.) McCartney offered no evidence that any other women were offended by or complained about Strobert's emails. (McCartney Dep. 213:16–214:1, Doc. 38-3, at 39–40.) After the February 2006 EEO complaint, as far as McCartney knew, Strobert never sent out any inappropriate emails. (McCartney Dep. 239:21–240:4, Doc. 38-3, at 59–60.)

On December 6, 2005, during a period in which McCartney was on leave because of her car accident, she came into work to drop something off. (EEO Complaint ¶ 18, Doc. 38-8, at 19; Doc. 37, ¶ 64c; Doc. 50, ¶ 64c.) While she was there, Strobert told her that he did not invite her to the office Christmas party or a farewell party for an Officer Siko because "some of the guys felt uncomfortable" with it, and "the guys didn't want [him] to invite [her]." (*Ids.*) McCartney offered the following testimony on the matter:

Q. . . . [D]o you have any information whether he invited everybody else?

A. I believe he had mentioned that it was . . . some type of an office gathering. So that would lead me to believe that it was everybody else.

. . . .

Q. Now, do you have any evidence or facts that only men were invited to the Christmas party or the Siko farewell party?

A. No. But I do know I wasn't invited.

. . . .

Q. So you have no evidence or facts whether any women were there; correct?

12

A. No. I don't know who was there.

. . . .

Q. But you weren't the only female in the office totally; were you?

A. No. There were other secretarial staff.

(McCartney Dep. 147:4–10, Doc. 38-2, at 100; *id.* 196:9–21, Doc. 38-3, at 28; *id.* 199:5–7, Doc. 38-3, at 31.)

During the same office visit, McCartney wrote, Strobert was trying to explain "why Manion is the way he is. He referred to Manion as the 'Alpha Male' in describing him. I felt as if this was Sgt. Strobert's way of [telling me] that Manion was attempting to be domineering over me and that I was to be submissive to him." (EEO Complaint ¶ 20, Doc. 38-8, at 20; Doc. 37, ¶ 64d; Doc. 50, ¶ 64d.)

On January 8, 2006, McCartney sent Strobert a squad-change request, which she carbon-copied to Lt. Martin; the next day, the email came back to her from Strobert as deleted and not read. (EEO Complaint ¶ 21, Doc. 38-8, at 20; Doc. 37, ¶ 64e; Doc. 50, ¶ 64e.) On the day that McCartney sent her request, Strobert was transferred to a different barracks. (McCartney Dep. 212:11–15, Doc. 38-3, at 38.) By January 9, the day that Strobert deleted the email, he was reassigned to the Lewistown PSP. (*Id.* 213:3–11, Doc. 38-3, at 39; *id.* 241:16–20, Doc. 38-3, at 61 (affirming that Strobert was transferred to the Lewistown barracks).)

On January 31, 2006, Strobert was visiting the Altoona office, and was "out by the secretaries' area telling stories about how 'females are less courteous than males.'" (EEO Complaint ¶ 38, Doc. 38-8, at 24; Doc. 37, ¶ 64f; Doc. 50, ¶ 64f.)

### (d) Allegations against Killion

On January 27, 2006, Killion asked McCartney to say goodbye when she steps out of the office.[11] (EEO Complaint ¶ 30, Doc. 38-8, at 22.) Killion sent McCartney an email on January 30, 2006, explaining that his request was in reference to a day the previous week when she had taken personal leave without making it known that she was leaving.[12] (*Id.* ¶ 31, Doc. 38-8, at 22–23.) The policy by which LEOs were to let supervisors or clerical staff know if they were leaving had been "in place for years at the Altoona office and was common courtesy." (Killion Decl. ¶ 8, Doc. 38-6, at 38.) Clerical staff asked Smolko to encourage LEOs to let clerical staff know when they were coming and going, so he did so. (Smolko Decl. ¶ 10, Doc. 38-5, at 62.) "Clerical staff receives the overwhelming majority of business-related calls to the Altoona office. . . . Clerical staff approached me and informed me that they were having difficulty with this responsibility because officers were not letting them know when they were in or out of the office."[13] (*Id.*) Smolko stated that he was not singling McCartney out. (*Id.*) McCartney acknowledged that Smolko brought up the "say goodbye" policy at an office meeting a few days after her conversation with Killion. (McCartney Dep. 243:9–19, Doc. 38-3, at 62.)

### (e) Use of profane language

What's up with all the "F" words? Smolko isn't the only one here using such nasty profanity. I'm sitting at my cubicle and all of a sudden I'm hearing the "F" word from somewhere across the squad room. It is my understanding that conduct that has the purpose or effect of creating an offensive work

---

[11] Without reference to the record, plaintiff stated that others were not treated in this fashion. (Doc. 50, ¶ 74a.)

[12] Without reference to the record, plaintiff stated that the purpose was to harass. (Doc. 50, ¶ 74b.)

[13] Plaintiff disputed without reference to the record. (Doc. 50, ¶ 77.)

14

environment is not tolerated. This "F" word has no purpose and is offensive to me. I known I may hear this in the bars, but in the office, personnel should not be intoxicated and act professionally.

(EEO Complaint ¶ 40, Doc. 38-8, at 24.) McCartney also addressed the matter of profane language in her deposition:

Q. In any of these uses of offensive language, none of them were ever addressed directly to you; right?

A. I don't recall anybody ever—I don't recall a particular time when it was like somebody called me like a F-something, if that's what you're asking?

Q. Yeah, that is what I'm asking. Nobody ever came up and said Wendy, F you?

A. No.

Q. Wendy, you're an F'ing B?

A. Oh, my gosh—never, no.

. . . .

Q. But did they ever use it in a sexual sentence, in your presence?

A. Not that I recall.

(McCartney Dep. 386:6–17, 387:15–17, Doc. 38-4, at 75, 76.)

### (f) Butler's investigation and its outcome

On February 10, 2006, Butler informed McCartney that he would conduct an investigation into the allegations of her complaint, which he did. (Butler Decl. ¶ 2, Doc. 38-7, at 8; McCartney Dep. 79:23–25, Doc. 38-2, at 48 (confirming that Butler investigated).) After the investigation, Butler submitted the information he had gathered to Lt. Henry, Director of the PSP EEO Office. (Butler Decl. ¶ 7, Doc. 38-7, at 9.)

Lieutenant Henry concluded that no discrimination or harassment had occurred (Doc. 38-7, at 59 ¶¶ 3–4), but nonetheless made several recommendations based on "inappropriate behavior" that he identified (*id.* at 60 ¶ 5). Butler counseled Smolko and reviewed PSP's sexual-harassment policy with him; Strobert's chain of command counseled him for his conduct. (Butler Decl. ¶ 8, Doc. 38-7, at 9; Doc. 38-7, at 62–65 (counseling memoranda); Smolko Decl. ¶ 11, Doc. 38-5, at 63 (indicating that he was counseled).)

McCartney was notified of the outcome of the investigation on April 9, 2006. (Doc. 37, ¶ 87; Doc. 50, ¶ 87.) She was not satisfied with the outcome and was informed that she could file a complaint with the Pennsylvania Human Resources Commission (PHRC). (Doc. 37, ¶ 88; Doc. 50, ¶ 88.)

### (3) Car assignments

LEOs at the Altoona office receive state cars when they transfer there, as did McCartney. (Doc. 37, ¶¶ 91, 94; Doc. 50, ¶¶ 91, 94.) The cars available are those not already being used by other officers. (Doc. 37, ¶ 92; Doc. 50, ¶ 92.) When an LEO's car is in need of replacement, because of excess mileage or other reasons, a replacement vehicle, new or used, is provided. (Hawk Decl. ¶ 33, Doc. 38-6, at 17; Smolko Decl. ¶ 14, Doc. 38-5, at 63.)

McCartney complained that Smolko, as vehicle officer, never offered her a new car. (Doc. 37, ¶ 89; Doc. 50, ¶ 89.) As recounted in Part I.A.2.b *supra*, Smolko did give McCartney a choice between a Malibu and a Grand Am, although McCartney described them as "hand-me-down vehicles that were left over."[14] (McCartney Dep. 248:7–13, Doc. 38-3, at 64.)

---

[14] Plaintiff stated, without support from the record, that "these vehicles were used, dirty, and unkempt and unwanted by the other officers." (Doc. 50, ¶ 90.)

Because of McCartney's accident and resulting limited duty, because she lived very close to the Altoona office, and because she put very few miles on her assigned car conducting undercover operations, the car that she was assigned did not need to be replaced because the mileage was low and it was not used extensively.[15] (Smolko Decl. ¶ 16, Doc. 38-5, at 63–64; Hawk Decl. ¶¶ 6–7, 35, Doc. 38-6, at 11, 17.) According to McCartney's EEO complaint, Smolko offered Manion's Taurus to Burns (EEO Complaint ¶ 34, Doc. 38-8, at 23); Hawk stated that it was he who offered the Taurus to McCartney, but she declined, saying she was satisfied with the Focus she was driving at the time (Hawk Decl. ¶ 37, Doc. 38-6, at 18).

"On another occasion," declared Hawk, "a brand new Honda Accord was assigned to the Altoona office and I offered it to Plaintiff; however, Plaintiff stated that she was satisfied with the Focus she was driving."[16] (Hawk Decl. ¶ 37, Doc. 38-6, at 18.)

On February 6, 2008, McCartney asked Smolko for a new car. (Doc. 37, ¶ 98; Doc. 50, ¶ 98.) Smolko, who was no longer the automotive officer, informed McCartney that the decision was up to Sergeant Bush and EO3 Stratton. (Doc. 37, ¶ 99; Doc. 50, ¶ 99.)

On October 9, 2008, McCartney asked Bush for a new Sebring and told Bush that the larger car may help her back. (Doc. 37, ¶ 100; Doc. 50, ¶ 100.) On October 10, Bush responded that the Sebring would be replacing the car that Butler had "cracked up," but that McCartney could have the Monte Carlo, which is a large car and might help her back. (Doc. 37, ¶ 101; Doc. 50, ¶ 101.) On October 29, car assignments were made. McCartney

---

[15]Plaintiff disputed without support from the record. (Doc. 50, ¶ 95.)

[16]Plaintiff disputed this factual statement, citing page 30 of her (unverified, single-spaced) declaration (which fails to comply with 28 U.S.C. § 1746) in support of her claim that she was never offered the Honda Accord, but there is nothing on page 30 or the surrounding pages that speaks to this matter. (Doc. 50, ¶ 97; McCartney Decl., Oct. 26, 2010, Doc. 50-2, at 30.)

got the Monte Carlo; the Sebring was placed as a "pool car"; and a male officer got McCartney's Focus.[17] (Email from Wayne A. Bush, Dist. Office Cmdr., to Wendy McCartney et al. (Oct. 29, 2008, 1:30 pm), Doc. 38-8, at 41.)

### (4) Strobert assignment and his visits to the Altoona office

On or about April 4, 2006, after Strobert had transferred to the Lewistown barracks, Smolko assigned a matter to McCartney in which Strobert, as the station commander in Lewistown, was the complainant. (Doc. 37, ¶ 104; Doc. 50, ¶ 104.) McCartney believed, as of April 4, 2006, that the assignment to a case involving Strobert was retaliation, harassment, and intimidation by Smolko. (Doc. 37, ¶ 107; Doc. 50, ¶ 107.) The only contact with Strobert that this assignment would have required McCartney to make was to send him an email at the end of the investigation. (McCartney Dep. 262:8–17, Doc. 38-3, at 77; Email from Daniel Hawk, Sgt., to Wendy R. Macknair, LEO (Apr. 6, 2006, 12:56 pm), Doc. 38-8, at 43.)

Strobert made five visits to the Altoona office after his transfer, on January 31, 2006; March 30, 2006; July 25, 2006; November 21, 2006; and December 1, 2008. (Doc. 37, ¶ 109; Doc. 50, ¶ 109.) On the December 1, 2008, visit, Strobert was in the Altoona office when McCartney returned from lunch. (McCartney Dep. 335:16–25, Doc. 38-4, at 34.) Whe she walked into the room, he said hello to her, but she ignored him. (*Id.*

---

[17] Plaintiff denied, citing her declaration generally, but as judges are not pigs, the Court declines this opportunity to go "hunting for truffles" buried in plaintiff's declaration. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). *See also* Fed. R. Civ. P. 56(e)(2) (allowing a court to consider a fact undisputed if the attempted controversion is not properly supported); L.R. 56.1 ("Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.").

337:1–4, Doc. 38-4, at 36.) She believed that Strobert's returns to the Altoona office after he was reassigned were "just to harass [her] more." (*Id.* 75:4–25, Doc. 48-6, at 19.)

### (5) Smolko visits the Back Room Saloon

On May 6, 2006, Smolko was in a bar, the Back Room Saloon, with some trooper friends and their wives. (Doc. 37, ¶ 111; Doc. 50, ¶ 111.) While Smolko was there, McCartney came into the bar on assignment. (Doc. 37, ¶ 112; Doc. 50, ¶ 112.) Smolko had assigned McCartney to do that investigation. (Smolko Dep. 60:1–12, May 6, 2010, Doc. 48-4, at 15.) Smolko did not know that McCartney would enter the bar that night. (Smolko Decl. ¶ 21, Doc. 38-5, at 65.) At no point did he describe McCartney or disclose her identity to anybody. (*Id.*) The bar was relatively crowded that evening. (*Id.*) He did not speak to McCartney while he was at the bar, and he left not long after she arrived. Doc. 37, ¶ 113; Doc. 50, ¶ 113.)

McCartney believed that Smolko came to the bar to retaliate against her. (McCartney Dep. 284:16–25, Doc. 38-3, at 92.) She wrote in her report on that date:

> Let it be noted that during the 05/06/06 investigation EO3 SMOLKO was inside the premises off duty with a group of several male acquaintances. While he was still inside the premises, I saw EO3 SMOLKO look at me. Shortly thereafter, I then noticed that the group of males that he was associating with were looking at me in a peculiar, irregular way that made me believe my identity may have been compromised.

(Wendy R. Macknair, Pa. State Police Admin. Investigation Report (May 6, 2006), Doc. 38-8, at 50.) McCartney did not hear what Smolko told the people that he was with. (McCartney Dep. 280:3–16, Doc. 38-3, at 88.)

After McCartney complained about Smolko being in the bar, Hawk investigated. (Hawk Decl. ¶ 40, Doc. 38-6, at 18.) He spoke with Smolko and two of the three troopers

he was with. (*Id.*) They all told him that Smolko had not identified McCartney in any way. (*Id.*) Smolko only said that one of his "people" was in the establishment.[18] (*Id.*)

### (6) Assignment to The Spot

On May 7, 2006, Smolko assigned McCartney to investigate The Spot in Johnstown to see if the establishment was serving food.[19] (Smolko Dep. ¶ 23, Doc. 38-5, at 65.) In order to complete this investigation, McCartney would have had only to enter the establishment and ask for food.[20] (Killion Decl. ¶ 6, Doc. 38-6, at 38.) She never completed the assignment or entered The Spot; it was reassigned because of her pregnancy. (Doc. 37, ¶ 122; Doc. 50, ¶ 122.)

### (7) PHRC complaint

On May 2, 2006, McCartney filed a complaint with the PHRC. (PHRC Complaint, May 2, 2006, Doc. 38-8, at 66.) The complaint named only PSP as a respondent. (*Id.*) The gravamen of the complaint was sexual harassment and discrimination, not retaliation. (*Id.* ¶¶ 5–34, Doc. 38-8, at 67–69.) The PHRC served the complaint by mail on PSP at Elmerton Avenue, Harrisburg, on June 9, 2006. (Doc. 37, ¶ 129; Doc. 50, ¶ 129.) On January 29, 2009, the PHRC issued a letter to McCartney saying that her complaint had been dismissed "because the facts of the case do not establish that probable cause exists to credit the allegations of unlawful discrimination." (Letter from Homer C. Floyd,

---

[18] Plaintiff denied the contents of Hawk Decl. ¶ 40 without reference to the record. (Doc. 50, ¶ 115.)

[19] Plaintiff denied in part without reference to the record. (Doc. 50, ¶ 120.)

[20] Plaintiff denied, referring to Pl.'s Exh. 37, but Exhibit 37 contains nothing relevant to the assignment in question. (Doc. 50, ¶ 121; Doc. 48-10, at 33–34.)

Executive Dir., PHRC, to Wendy McCartney (Jan. 29, 2009), Doc. 38-9, at 7.) The PHRC's report of their investigation indicates that the entire inquiry was focused on determining the facts related only to McCartney's claims of sexual harrassment. (PHRC Findings, Doc. 38-9, at 9, 10–23.)

## (8) May 2006 complaint about Killion

On May 15, 2006, McCartney sent an email to Butler complaining that Killion was treating her differently from men because, she claimed, she was being forced to follow contractual travel times at the end of her shift but Killion and other LEOs were not following the same guidelines. (Doc. 37, ¶ 143; Doc. 50, ¶ 143.) Butler investigated this allegation. (Doc. 37, ¶ 145; Doc. 50, ¶ 145.) He ultimately determined no pattern of abuse, although he did note some "minor individual violations/discrepancies" and counseled the individual officers. (Memorandum Concerning EEO Investigation 38-2206 from Capt. Thomas P. Butler, BLCE, to Director, BLCE (July 23, 2006), Doc. 38-7, at 80, 81–82; Butler Decl. ¶ 14, Doc. 38-7, at 11 (noting that no evidence of discrimination was found).)

## (9) Continuing use of foul language in the Altoona PSP Office

McCartney claims that the foul language that she complained about in her February 2006 EEO complaint never stopped. (Doc. 37, ¶ 158; Doc. 50, ¶ 158.) She described certain instances of the use of the "F" word, including several on one occasion by Butler. (Doc. 37, ¶ 159; Doc. 50, ¶ 159.) However, none of the defendants that used this word ever directed or addressed such language to McCartney, and the word was used only as an adjective, not in a sexual manner. (Doc. 37, ¶¶ 161–62; Doc. 50, ¶¶ 161–62.) None of the defendants ever called plaintiff a "B." (Doc. 37, ¶ 160; Doc. 50, ¶ 160.) McCartney has no evidence that foul language was ever used by Hawk, Killion, or Gebhart. (Doc. 37, ¶ 164; Doc. 50, ¶ 164.) She asserted that Strobert used foul language,

but was unable to provide a time, date, or year that it occurred. (McCartney Dep. 329:19–24, Doc. 38-4, at 29.)

### (10) Events in late 2006: Mountain Top, the Ford Focus inspection sticker, the Olive Garden Christmas party

#### (a) Mountain Top assignment

Mountain Top Sportsman Association (Mt. Top) is a private club. (Doc. 37, ¶ 166; Doc. 50, ¶ 166.) On or about September 22, 2006, McCartney was assigned to investigate Mt. Top. (Doc. 37, ¶ 168; Doc. 50, ¶ 168.) Prior to this assignment, McCartney had attended a two-hour training session on Small Games of Chance (SGOC) audits. (Doc. 37, ¶ 167; Doc. 50, ¶ 167.)

On October 19, 2006, McCartney performed an inspection of Mt. Top but did not perform an SGOC audit. (Doc. 37, ¶ 175; Doc. 50, ¶ 175.) Whether Killion had instructed McCartney to perform such an audit, as compared to a less-intensive "review," is disputed. It is undisputed, however, that on November 20, 2006, Killion wrote her a memo asking her to explain her failure to conduct an audit. (Doc. 37, ¶ 178; Doc. 50, ¶ 178.)

#### (b) Olive Garden Christmas party

The following month, McCartney, along with the others in the Altoona office, was invited to the Olive Garden for a Christmas party that started on 4:00 pm on December 12, 2006.[21] (McCartney Dep. 200:9–14, Doc. 38-3, at 32; Email from Michelle Stine to Wendy McCartney et al. (Dec. 11, 2006, 2:26 pm), Doc. 38-12, at 31.) But rather than attend the Christmas party, McCartney went with her boyfriend, Sgt. Jendrzejewski, to the Olive Garden parking lot, and shot video of the cars that were there so that she could

---

[21] Plaintiff disputed without relevant reference to the record. (Doc. 50, ¶ 201.)

make a complaint that officers were using state cars to go to the party.[22] (McCartney Dep. 200:9–202:5, Doc. 38-3, at 32–34.)


### (c) The expired inspection sticker on McCartney's Focus
—and the related complaint

On December 14, 2006, McCartney sent an email to Maj. Charles J. Skurkis of the Internal Affairs Division in Harrisburg, complaining that Hawk had driven a car on December 8, 2006 with an expired inspection sticker. (Doc. 37, ¶ 196; Doc. 50, ¶ 196.) McCartney sent the complaint directly to Skurkis because she feared retaliation. (Email from Wendy R. McCartney, LEO, to Maj. Charles J. Skurkis (Dec. 14, 2006, 9:01 am), Doc. 38-12, at 25.)

Captain Willard M. Oliphant, Director of the Internal Affairs Division, responded on December 18, 2006, saying that Hawk's actions were "both reasonable and in conformance with the applicable law."[23] (Memorandum from Capt. Willard M. Oliphant, Dir. of Internal Affairs Div., to LEO Wendy R. McCartney (Dec. 18, 2006), Doc. 38-12, at 29.) McCartney has no evidence that this complaint about Hawk was ever communicated to any of the defendants.[24] (McCartney Dep. 297:4–10, Doc. 38-4, at 8.)


### (d) The complaint about the use of state cars to drive to Olive Garden

On December 18, 2006, McCartney sent an email to Maj. Skurkis complaining about the December 12 use of state cars to go to Olive Garden. (Doc. 37, ¶ 203; Doc. 50, ¶ 203.) During deposition, McCartney discussed her motivations for submitting these complaints:

---

[22]Plaintiff disputed without relevant reference to the record. (Doc. 50, ¶ 202.)

[23]Plaintiff disputed without relevant reference to the record. (Doc. 50, ¶ 198.)

[24]Plaintiff denied without reference to the record. (Doc. 50, ¶ 199.)

Q. . . . With regards to filing the complaint regarding the use of cars or filing the complaint regarding the driving of the Focus with the inspection expired, was it your understanding that as a liquor enforcement officer you had an obligation to file such complaints?

A. There is a directive . . . that when you become aware of violations you are to report them. However, these incidents were reported not only for that reason, but I would say more along the lines because I felt like I was backed into a corner like I was trapped with nowhere to go, and I needed some relief. I needed a way out, and I was doing whatever I could to get them to stop. I didn't know what else to do. And that's why I filed the complaints; looking for relief from the stress that I had to go through every day.

Q. And how did you think that filing the complaint about the cars would relate to relieving stress?

A. I was trying to get somebody in upper administration to pay attention to what I was saying, to pay attention to me, to listen to what I was saying and just hear me. And this was my way. I just didn't know what other way to do it. And I figured if they looked into this incident, or even the next incident, that eventually somebody would say hey, there's a pattern here.

(McCartney Dep. 107:11–108:16, Doc. 38-2, at 65–66.)

The Olive Garden complaint was forwarded to Maj. John P. Lutz on December 19, 2006. (Memorandum by Cpl. Noel Ruiz (Dec. 19, 2006), Doc. 38-12, at 39.)

(e) Hawk files complaint about McCartney's work on Mt. Top

Meanwhile, before any action was taken on McCartney's Olive Garden complaint, Hawk filed a complaint against McCartney, on December 29, 2006, based on the quality of her investigative work on the Mt. Top assignment. (Doc. 37, ¶ 181; Doc. 50, ¶ 181.)

(f) Investigation into McCartney's Olive Garden complaint

On January 4, 2007, Capt. Steven M. Johnson, Director, Operations Division, indicated that a limited investigation into McCartney's Olive Garden complaint would be

24

conducted. (Email from Capt. Steven M. Johnson, Dir., Operations Div., to Cpl. Noel Ruiz (Jan. 4, 2007, 4:32 pm), Doc. 38-12, at 42.)

The matter was formally assigned on February 5, 2007. (Wendy R. McCartney, Complaint Regarding Olive Garden Conduct on Dec. 12, 2006, Doc. 38-12, at 44.) McCartney submitted a memorandum with her allegations on February 9. (Memorandum from Wendy R. McCartney, LEO, to Sgt. Wayne E. Bush, Dist. Office Cmdr. (Feb. 9, 2007), Doc. 38-12, at 46.)

Sergeant Bush investigated the matter and interviewed several people, discovering in the process that to attend the Christmas party at Olive Garden, the attending officers would have had to vary from their normal driving routes by not more than 4.7 miles. (Memorandum from Sgt. Wayne E. Bush, Dist. Office Cmdr., to Maj. John P. Lutz. Dir., BLCE (Mar. 7, 2007), Doc. 38-12, at 49, 53.) Based on Bush's investigation, Major Lutz concluded that the LEOs' use of state vehicles to drive to Olive Garden was not a violation of PSP regulations or policy. (Memorandum from Maj. John P. Lutz, Dir., BLCE, to Dir., Bureau of Integrity & Prof'l Standards and Dir., Bureau of Human Res. (Mar. 9, 2007), Doc. 38-12, at 56.)

McCartney and the others involved were informed that the actions "did not constitute a violation of Department regulations and the allegations are UNFOUNDED," and that no administrative action would be taken. (Memoranda from Maj. John P. Lutz, Dir., BLCE, to LEO Wendy R. McCartney; EO3 Dennis Smolko; LEO Michael Mirabella; LEO James Coble; and LEO Christopher Burns (Mar. 9, 2007), Doc. 38-12, at 58–62.)

(g) Hawk's complaint about McCartney's Mt. Top investigation

Meanwhile, on December 29, 2006, two weeks before he retired, Hawk submitted a formal complaint about the quality of McCartney's work on the Mt. Top investigation. (Doc. 37, ¶ 181; Doc. 50, ¶ 181.) The investigation into Hawk's complaint was assigned

to Sgt. John C. Kean on January 3, 2007. (Sgt. Daniel L. Hawk, Complaint Concerning McCartney's Mt. Top Investigation (n.d.), Doc. 38-10, at 7.) Kean interviewed several persons and reviewed "significant amounts of documents" in his investigation. (Doc. 37, ¶ 183; Doc. 50, ¶ 183.)

During his investigation, Kean interviewed LEO William V. Bell, who recalled a conversation that he overheard between Killion and McCartney: "The conversation that they had, I didn't specifically hear him tell her to do an audit, but LEO Killion basically stated to her that an audit would be the right thing to do and he was instructing her on how to go about an audit . . . ." (Sgt. John C. Kean, Gen. Investigation Report (Feb. 16, 2007), Doc. 38-10, at 9, 16.)

On March 22, 2007, McCartney was given notice of a Pre-disciplinary Conference (PDC) regarding Hawk's complaint, which informed her that she would be given an opportunity to respond to the allegations in the complaint. (Memorandum from Capt. Steven M. Johnson, Dir., Operations Div., BLCE, to LEO Wendy R. McCartney (Mar. 22, 2007), Doc. 38-12, at 7.) At the PDC on March 26, McCartney stated that she "believe[d] that she addressed the allegations in [a previous] interview and ha[d] no further information to offer."[25] (Memorandum from Sgt. Wayne A. Bush, Dist. Office Cmdr., BLCE, to Capt. Steven M. Johnson, Dir., Operations Div., BLCE (Mar. 26, 2007), Doc. 38-12, at 9.)

On March 28, 2007, Capt. Johnson issued a memorandum sustaining the allegations that (1) McCartney failed to obey Killion's direct order to conduct an SGOC audit and (2) McCartney demonstrated incompetence by failing to conduct an SGOC

---

[25]McCartney wrote in her personal notes that she refused to say anything further in the PDC because she had not been provided with "any detailed information as to what Killion was accusing [her] of" and "how was [she] to defend herself against the unknown." (McCartney Notes, Doc. 48-3, at 9.)

audit. (Memorandum from Capt. Steven M. Johnson, Dir., Operations Div., BLCE, to Director, BLCE (Mar. 28, 2007), Doc. 38-12, at 11, 11–12.)

Major Lutz reviewed Johnson's conclusions and assessed discipline on April 2, 2007, noting as an "aggravating factor" that:

> Throughout this investigation, LEO McCartney displayed what can only be described as a cavalier attitude and a failure to take responsibility for her actions, instead choosing to blame everyone else. Her actions reveal a disregard not just for the excellence we strive for as an agency, but also for the minimum standards we require of every employee.

(Memorandum from Maj. John P. Lutz, Dir., BLCE, to Dir., Bureau of Integrity & Prof'l Standards, and Dir., Bureau of Human Res. (Apr. 2, 2007), Doc. 38-12, at 17.)

On May 31, 2007, McCartney was given a written reprimand, signed by Capt. Gebhart, for the Mt. Top matter. (Doc. 37, ¶ 189; Doc. 50, ¶ 189.) After filing a "series of grievances," McCartney reached a settlement with the BLCE that would result in the removal of the written reprimand from her official personnel file. (Doc. 37, ¶¶ 191–92; Doc. 50, ¶¶ 191–92.)

McCartney believed that Hawk's complaint regarding the Mt. Top investigation was retaliation against her for, among other things, her complaint regarding the misuse of state vehicles at Olive Garden and her complaint about Hawk knowingly driving a vehicle with an expired inspection sticker. (Doc. 37, ¶ 194; Doc. 50, ¶ 194.) She wrote in her notes that on December 28, 2006, she overheard Hawk "in his office talking on the phone to someone about how I sent a complaint to the Major about the after work Christmas Party. He said that he was told that what the officers did was not a big deal and that they didn't need to worry about it." (McCartney Notes, Doc. 48-10, at 1.) Hawk denies that, at the time he filed the complaint against McCartney, he knew about the Olive Garden complaint. (Hawk Decl. ¶ 23, Doc. 38-6, at 15.)

(11) McCartney's Employee Performance Review

For part of 2006, Killion was Acting EO3 and directly supervised McCartney and other LEOs; as part of his duties in this role, Killion prepared an Employee Performance Review (EPR) for McCartney, and submitted it to her on December 18, 2006.[26] (Doc. 37, ¶ 212; Doc. 50, ¶ 212.) His review was negative: he "noted that [McCartney] failed to comprehend and carry out instructions, was deficient in her knowledge of forms, lacked initiative, was unwilling to act as part of a team, and, in short, she [strove] only to meet the minimum standards."[27] (Killion Decl. ¶ 5, Doc. 38-6, at 38.) Hawk signed off on the EPR. (Hawk Decl. ¶ 26, Doc. 38-6, at 15.)

McCartney believed that this negative EPR was Killion's way of retaliating against her for her complaint about misuse of state vehicles at the Olive Garden Christmas party. (McCartney Dep. 137:15–138:9, Doc. 38-2, at 91–92.)

On December 29, 2006, McCartney appealed the EPR to Major Lutz. (Doc. 37, ¶ 221; Doc. 50, ¶ 221.) Lutz decided on January 5, 2007, that the EPR would need to be redone because it "was not completed in accordance with Department Regulations." (Memorandum from Maj. John P. Lutz, Dir., BLCE, to LEO Wendy R. McCartney (Jan. 5, 2007), Doc. 38-12, at 72.)

Smolko was assigned the task of preparing a new EPR for McCartney, which he did in the days preceding February 13, 2007. (Smolko Decl. ¶ 25, Doc. 38-5, at 65.) He

---

[26] Plaintiff contested the claim that Killion prepared the EPR as part of his duties as Acting EO3. (Doc. 50, ¶ 214.) However, this controversion is unsupported by her citations to the record. She cites Pl.'s Exh. 8, which is not present in the record at all, and three other exhibits that, although they are in the record, do not support her position. (*Id.*)

[27] Plaintiff denied, describing Killion's statements as "open ended . . . with no facts or dates and times to establish where, how, when, or why such events occurred," but cited nothing to controvert the claim that Killion's EPR did include such statements. (Doc. 50, ¶ 216.)

provided the EPR to Sergeant Bush for his input and approval; Bush returned the EPR to Smolko on February 13, at which point Smolko signed the EPR and delivered it to McCartney that same day. (*Id.*) Smolko's EPR was also negative; his overall rating of her was "Unsatisfactory," and he included explanatory narrative comments:

> L.E.O[.] MCCARTNEY displays a studious knowledge of Department policies and procedures and contractual agreements and stays within the boundaries of these dictates. The issue of this rating period and the resulting overall rating [lie] directly in unwillingness on her part to apply her knowledge in a fashion that would make her an efficient Officer and a willingness to strive for more than minimum effectiveness and performance. Her resistance to supervisory oversight, working as a team member, and effectively learning and applying policies and office procedures all [have] contributed to this outcome. L.E.O[.] MCCARTNEY is noticeably discontented in her current job. That discontent shows in its effect on her performance and attitude.

(EO3 Dennis J. Smolko, Employee Performance Review of Wendy R. McCartney for Dec. 1, 2005 to Nov. 30, 2006 (Feb. 13, 2007), Doc. 38-5, at 69, 72.)

McCartney appealed this EPR as well, "most notably because EO3 Smolko didn't supervise [her] during the 2006 calendar year." (Memorandum from LEO Wendy R. McCartney to Dir., BLCE (Mar. 20, 2007), Doc. 38-12, at 78.) In denying this second appeal, Major Lutz noted that her first appeal was sustained because "EO3 Killion was an 'Acting' supervisor, and was therefore not trained or qualified" to rate McCartney. (Memorandum from Maj. John P. Lutz, Dir., BLCE, to LEO Wendy R. McCartney (Mar. 29, 2007), Doc. 38-12, at 80.) As a result, wrote Major Lutz, "the responsibility of preparing [McCartney's] EPR was transferred to the only other supervisor in the District office at that time, EO3 Dennis Smolko." (*Id.*) Since Smolko did prepare the EPR—doing so, according to Major Lutz, "based upon his observations and knowledge of [her] performance"—Lutz told McCartney that she "cannot have it both ways," and decided that Smolko's EPR would stand.[28] (*Id.*)

---

[28] Plaintiff introduced evidence that the EPR was not in compliance with the applicable administrative regulations (Doc. 50, at ¶ 213), but the EPR's compliance, or lack

McCartney claims that the EPR is evidence that Smolko discriminated against her based on gender and retaliated against her for a variety of past behavior, including her submission of the February 2006 EEO complaint, her successful appeal of Killion's EPR, and her complaint about the use of state vehicles to attend the Olive Garden Christmas party. (Doc. 37, ¶¶ 236, 239; Doc. 50, ¶¶ 236, 239.) She admits, however, that she has no evidence as to how Smolko evaluated other officers, including male officers, in the Altoona office. (Doc. 37, ¶ 240; Doc. 50, ¶ 240.)

## (B) Procedural history

This case had its genesis in plaintiff's filing of her complaint (Doc. 1) on September 21, 2009. In fairly short order, defendants filed a partial motion to dismiss on November 25, 2009. (Doc. 7.) The Court granted this motion on May 27, 2010, also granting plaintiff leave to file an amended complaint to cure the defects of the original, except as to her claims of age discrimination and for violation of the PHRA against the PSP, which the Court concluded would be futile. (Doc. 21.) Plaintiff filed an amended complaint (Doc. 25) on June 16, 2010; unlike the original complaint, the amended complaint did not name Jeffrey Miller as a defendant. Defendants answered on July 15. (Doc. 28.)

On July 20, 2010, defendant Manion filed a motion for judgment on the pleadings as to claims filed against him (Doc. 29); later that same day, plaintiff requested voluntary dismissal with prejudice of those same claims. On July 28, the Court granted the voluntary dismissal that plaintiff requested and denied defendant's motion as moot. (Doc. 33.)

---

thereof, with the PSP's internal adminstrative requirements does not affect the legal issues in this case.

On September 1, 2010, defendants filed a motion for summary judgment (Doc. 36), along with a statement of facts (Doc. 37) and supporting exhibits (Docs. 38 to 38-14) and a brief in support (Doc. 39). After several extensions of deadlines, plaintiff filed a brief in opposition (Doc. 49) on October 26, 2010, as well as an answer to defendants' statement of facts (Doc. 50) and her own supporting exhibits (Docs. 48 to 48-10). Defendants filed a reply brief on November 11, 2010. (Doc. 53.)

All filing deadlines having passed, the pending motion is ripe for adjudication.

## II. Standard of Review

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600

(3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case that it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

**III. Discussion**

The complaint contains two counts: Count I, containing claims against the individual defendants, and Count II, containing claims against the PSP. The individual defendants also claim qualified immunity. Each issue will be discussed in turn.

*(A) Title VII sexual harassment and gender discrimination against the PSP*[29]

Exhaustion of administrative remedies is a prerequisite to filing a Title VII claim in federal district court. *Glus v. G.C. Murphy Co.*, 562 F.2d 880, 885 (3d Cir. 1977) (citing, *e.g.*, *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 246 n.8 (3d Cir. 1975); *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1092–93 (6th Cir. 1974)). For an employee of an entity other than the federal government—such as plaintiff, who was an employee of the Commonwealth of Pennsylvania—"a complaint must first be filed with the state agency charged with enforcing the laws against employment discrimination, if one exists." *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984) (citing 42 U.S.C. § 2005e-5(c), (d)). A complainant must wait 180 days before pursuing relief in federal court. *Id.* The statute of limitations only begins to run when there is "final agency action" on the administrative charge. *Id.* Final agency action may take the form of a "right to sue" letter, "in which the agency states that it sees no reason to take action," or it may consist of an agreement between the employer and the state agency. *Id.* (citing 42 U.S.C. § 2000e-16).

The appropriate state agency in this case is the Pennsylvania Human Resources Commission. There is no dispute that plaintiff did file a complaint with the PHRC on May 2, 2006. (Doc. 38-8, at 66.) The PHRC issued its findings on January 7, 2009, concluding that "the evidence [was] not sufficient to show an unlawful act of

---

[29]Plaintiff also claims against the individual defendants under § 1983 for alleged violations of the Equal Protection Clause of the Fourteenth Amendment. The analysis for these claims is the same as it is for the parallel claims under Title VII. *Morrissey v. Luzerne County Cmty. Coll.*, 117 F. App'x 809, 814 n.4 (3d Cir. 2004) (citing *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997)) ("[T]he showing plaintiff must make for § 1983 gender discrimination is the same as for Title VII claims."). Thus, the substantive analysis in this section applies with equal force to the gender-discrimination claims against all defendants.

discrimination occurred" and declining to take any further action. (Letter from John Means, Human Relations Representative, to Wendy McCartney (Jan 7, 2009), Doc. 38-9, at 8.) Plaintiff filed her complaint in federal court on September 21, 2009 (Doc. 1), which was well within the two-year limitations period.

However, the subject matter of the complaint brought in federal court must be "fairly within the scope" of the administrative complaint. *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984) (citing, e.g., *Hicks v. ABT Assocs.*, 572 F.2d 960, 966 (3d Cir. 1978); *Ostapowicz v. Johnson*, 541 F.2d 394, 399 (3d Cir. 1976)). Case law provides some useful examples of the proper "scope" of administrative complaints.

In *Waiters*, the plaintiff filed an informal EEOC complaint against her employer, the defendant. *Id.* at 234. About a year later, the plaintiff filed a formal EEOC complaint alleging retaliation for the filing of her informal complaint. *Id.* at 235. Four months after that, the plaintiff was discharged; she filed suit in federal court alleging that the discharge was in retaliation for the formal complaint she filed. *Id.* at 236. The district court had dismissed her complaint on the grounds that the plaintiff had failed to exhaust her administrative remedies regarding the discharge. *Id.* at 234. The Third Circuit reversed, noting that although the formal complaint alleged only retaliation, not retaliatory discharge, the "core grievance" of retaliation was the same, and that the plaintiff's allegations in federal court were within the scope of the EEOC's investigation of the formal EEOC complaint. *Id.* at 238.

In a separate case, the Third Circuit held that "the parameters of the civil action . . . are defined by the scope of the EEOC investigation [that] can reasonably be expected to grow out of the charge of discrimination, including new acts" that occurred while the EEOC proceedings were pending. *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398–99 (3d Cir. 1976) (internal citations omitted) (citing, e.g., *Gamble v. Birmingham S. R.R. Co.*, 514 F.2d 678 (5th Cir. 1975); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455

(5th Cir. 1970)). In *Ostapowicz*, the original EEOC charge filed by the employees' union in 1968 alleged discrimination against female members of the defendant company's bargaining unit. *Id.* at 397. Some eighteen months later, the plaintiff filed two further charges of sex discrimination not in the bargaining unit but in the machine-shop division, where the plaintiff herself worked. *Id.* at 397, 399. Three years later, after the EEOC's settlement efforts had failed, the plaintiff requested a right-to-sue letter from the EEOC, referring to the original 1968 charge, but also mentioning the two subsequently filed charges. *Id.* at 397. The Third Circuit held that the plaintiff could bring her claims in federal court despite (1) the basis for the right-to-sue letter being the charge of discrimination in the bargaining unit and (2) the fact that the plaintiff's particular claims regarded her employment in the machine-shop division, the specifics of which were alleged in the two still-pending charges. *Id.* at 399. The court stated that the "additional charges . . . may fairly be considered explanations of the original charge and growing out of it." *Id.*

In a relatively recent case applying the *Waiters* rule, the plaintiff had applied for one of two available positions at the Department of Defense, but was rejected in favor of two female candidates. *Anton v. Perry*, 82 F.3d 1291, 1294 (3d Cir. 1996). A disabled veteran, the plaintiff filed a formal complaint alleging disability discrimination, which was eventually appealed to the EEOC. *Id.* The EEOC found no discrimination; the plaintiff sued in federal court, alleging both disability discrimination and gender discrimination. *Id.* at 1294, 1293. On appeal, the Third Circuit affirmed summary judgment on the gender-discrimination claim, holding that the plaintiff failed to exhaust his administrative remedies. *Id.* at 1295. The court noted that gender discrimination was never alleged in the formal EEOC complaint, nor was it part of the investigation, and so a claim for gender discrimination was outside the scope of the original complaint. *Id.* at 1296.

In this case, the PHRC complaint alleged only sexual harrassment and discrimination against the PSP. The Court may now consider the full range of plaintiff's claims against the PSP only if her claims of gender discrimination and retaliation were fairly within the scope of her administrative-level complaint. Although gender discrimination is within this scope, retaliation is not.

The thirty-five paragraphs of the PHRC complaint make reference only to plaintiff's membership in the protected class of "Sex - Female," and discrimination on that basis. Neither the word "retaliation" nor any form or synonym of it ever appears in the complaint; plaintiff instead averred that the PSP's supervisors were trying to "harass, intimidate, demoralize, and discriminate against" her. (PHRC Complaint, May 2, 2006, at ¶ 29, Doc. 38-8, at 69.) The PHRC complaint contains no allegations that plaintiff undertook protected activity and then suffered adverse employment action as a result. Given the contents of the PHRC complaint, there is no basis to conclude that the PHRC should have investigated any matters relating to retaliation. And indeed, the PHRC's findings reveal that no such investigation ever took place. (PHRC Findings (Jan. 29, 2009), Doc. 38-9, at 7–23.)

Because the PHRC complaint and following investigation only concerned gender-based discrimination, the related claims in the present case are the only claims against the PSP that the Court may consider; the claims against the PSP based on retaliation must be disregarded. The gender-based claims against the PSP that may be addressed are plaintiff's claims for disparate treatment and for a hostile work environment.

(1) Disparate treatment

(a) Legal standard

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court articulated a burden-shifting scheme for claims of disparate treatment, which is applied in the Third Circuit. First, the plaintiff bears the burden of establishing a prima facie case. If the plaintiff does, a presumption of discrimination arises, which the defendant may rebut with evidence of a legitimate nondiscriminatory reason for the adverse employment action. Successful rebuttal shifts the burden back to the plaintiff to show that those nondiscriminatory reasons were in fact pretext for discriminatory action.

The plaintiff's prima facie case requires a showing by a preponderance of the evidence that: (1) the plaintiff belongs to a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff was subject to an adverse employment action despite being qualified; and (4) the adverse employment action was under circumstances raising an inference of discriminatory action, while the employer continued to seek persons with similar qualifications for the position. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802); *id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). The burden of production to make this showing is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The prima facie case is meant to be flexible and tailored to the specific context of each case. *Id.* at 253 n.6 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff establishes a prima facie case, a presumption of discriminatory action arises; it is presumed that, without further explanation from the defendant, the adverse employment action was "more likely than not based on the consideration of impermissible factors." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977)).

Once the plaintiff has made out a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Sarullo*, 352 F.3d at 798 (citing *McDonnell Douglas*, 411 U.S. at 802). The defendant must "clearly set forth, through the introduction of admissible evidence, reasons for its action which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* at 799 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 507) (internal quotation marks omitted). If the defendant meets this burden, the presumption of discrimination is rebutted. *Id.* at 797 (citing *Burdine*, 450 U.S. at 255).

If the defendant successfully rebuts the presumption of discrimination, the burden of production then shifts back to the plaintiff, who must produce evidence sufficient to allow a reasonable fact-finder to conclude that the proffered reasons for the adverse employment action were a pretext for illegal discrimination or retaliation. *Id.* at 799.

(b) Protected class; qualification for the position

There is no dispute that plaintiff, being female, belongs to a protected class. And, although neither plaintiff nor defendants explicitly devote any space in their submissions to the Court on the question of whether plaintiff was qualified for her position, it is reasonable to assume, for purposes of the pending summary-judgment motion, that she was. Plaintiff has submitted prior favorable EPRs from the first several years of her time with the BLCE (Doc. 48-7, at 33–48), and the parties agree that plaintiff worked for the BLCE for about seven years. It is safe to conclude at this stage of the proceedings that the PSP would not have hired plaintiff, or retained her for so long, if she were not qualified for her position. The two elements of plaintiff's prima facie case that are actually contested are whether she was subject to an adverse employment action and, if she was, whether this action was taken under circumstances giving rise to an inference of discrimination.

(c) Adverse employment action

In general terms, an "adverse employment action" under Title VII is "an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)). Such a "significant change in employment status" may take the form of "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (citing, *e.g., Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 887 (6th Cir. 1996); *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 456 (7th Cir. 1994); *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)), and "in most cases inflicts direct economic harm," *id.* at 762. Postemployment action by an employer "can constitute discrimination under Title VII if [it hurts] a plaintiff's employment prospects." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 157 (3d Cir. 1999) (citing, *e.g., Passer v. Am. Chem. Soc'y*, 935 F.2d 322, 331 (D.C. Cir. 1991); *London v. Coopers & Lybrand*, 644 F.2d 811, 816 (9th Cir. 1981); *Shehadeh v. Chesapeake & Potomac Tel. Co.*, 595 F.2d 711, 719–21 (D.C. Cir. 1978)). However, a smattering of minor grievances, even if inconvenient, do not amount to adverse employment action under Title VII. *See Clayton v. Pa. Dept. of Pub. Welfare*, No. 05-0768, 2007 WL 575677, at *9–10 (M.D. Pa. Feb. 20, 2007) (Jones, J.) ("rather *de minimis* administrative actions with which [plaintiff] disagreed," including the moving of plaintiff's mailbox to a "remote location," the removal of his desk from his office without notice, and his not being given the office he wanted, did not constitute adverse employment actions).

Plaintiff's basis for claiming that she was subject to an adverse employment action consists almost exclusively of evidence of that last category of grievances: rather *de minimis* administrative actions. These actions, by plaintiff's description, consist of "filthy

39

language shouted out at a screaming level, pictures of people dressed as a penis, disparate treatment on the use of automobiles based upon sex, providing one person a filthy dirty automobile, excluding, on a persistent basis, one person from get-togethers, [and] intentionally distorting and skewering an investigation." (Doc. 49, at 17.) Even assuming that the evidence before the Court supports this characterization of events,[30] nothing in this catalogue of sorrows affected plaintiff's compensation or the terms, conditions, or privileges of her employment. Plaintiff admitted as much during her deposition. (McCartney Dep. 354:13–21, Doc. 38-4, at 53 (stating that nothing that either Strobert or Smolko did affected her pay, position, benefits, or where she worked); *id.* 400:23–401:9, Doc. 38-4, at 81–82 (stating the same as to Butler, with one exception).) The record otherwise supports the notion that none of these actions constituted an adverse employment action; there is no evidence that plaintiff was rendered unable or less able to perform the duties of her position.[31]

---

[30] The evidence reveals, rather, that plaintiff's overview of events is exaggerated. The record reflects that some of the individual defendants used profanity, but not to the extent that plaintiff describes. Confirmed instances are fairly scattered, and the one use of profanity that the evidence and briefing particularly highlight—Smolko's utterance of "f—ing Barney"—is somewhat less egregious than plaintiff's depiction, which brings to mind an image of howling baboons hurling constant obscenities with relentless vigor. Nothing in the record attests to plaintiff's description of any vehicle she was assigned as "filthy" or "dirty." And, although there is no dispute that there are some non-work-related social gatherings to which plaintiff was not invited, there are also many to which she was invited, rendering inaccurate her claim that she was excluded from social gatherings on a "persistent basis."

[31] Plaintiff argues in her brief that "issues of officer safety" raised in her counterstatement of material facts establish an adverse employment action. (Doc. 49, at 19 (citing Doc. 50, ¶¶ 110–14). This argument is an apparent reference to the fact that Smolko was in the Back Room Saloon when plaintiff entered while on duty, that Smolko recognized her, and plaintiff felt her identity may have been compromised. Although

Of the behavior by her superiors that plaintiff identifies as objectionable, only the negative EPR could possibly rise to the level of an adverse employment action. Although the EPR was not a postemployment action, *Durham Life Ins. Co.*, 166 F.3d 157, it had a potential negative effect on plaintiff's prospects for employment. However, there is a dearth of evidence that shows any actual negative effect.

Plaintiff wrote in her notes that she applied for a job on or by December 21, 2006 (McCartney Notes, Doc. 48-10, at 25), which was three days after Killion issued the eventually repealed EPR. Nothing in those notes, however, suggests that this EPR had, or even that plaintiff thought the EPR had, any role in her being denied that position. Her notes of another position that she applied for on February 15, 2007 and was denied on February 20, 2007—two and five days, respectively, after Smolko's EPR was upheld —likewise make no mention of any possible impact that the EPR might have had on being turned down (*Id.* at 26.) As for other failed attempts at securing different employment described in plaintiff's notes, she intimates no link to the EPR. (*Id.* at 26–30.) Meanwhile, in any case, plaintiff continued to work for the BLCE at the Altoona office. It is undisputed that once plaintiff left the BLCE, she sought no further employment.

Because the only possibly adverse employment action taken against plaintiff did not actually have a tangible effect on her employment or prospects for employment, there is no reasonable basis to conclude that plaintiff suffered an adverse employment action.

---

there is a possible case to be made that continued exposure to unreasonably dangerous situations on the job could be considered an adverse employment action, how the scenario that played out at the Back Room Saloon relates to plaintiff's safety is not obvious and has not been made clear.

(d) Circumstances suggesting discrimination

Even assuming that the EPR was an adverse employment action, a proposition that the evidence does not support, plaintiff would have had to establish that the EPR was completed in circumstances that gave rise to a presumption of discrimination, which she has not done.

The evidence most often used to establish a "nexus" between an adverse employment action and impermissible discriminatory treatment is evidence that a plaintiff "was treated less favorably than similarly situated employees who are not in plaintiff's protected class." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 366 (3d Cir. 2008) (citing *Iadimarco v. Runyon*, 190 F.3d 151, 162 (3d Cir. 1999)). Since plaintiff has presented no evidence of how Smolko (or Killion) evaluated male LEOs, she has failed to meet her burden of proof in establishing that similarly situated employees were treated better. The evidence does not reveal whether male LEOs with a performance record similar to plaintiff's received more or less favorable performance reviews than did plaintiff herself.

Because the only purportedly, but not actually, adverse employment action that was taken against plaintiff was not taken under circumstances giving rise to an inference of discrimination, plaintiff has failed to make out a prima facie case of disparate treatment.

(e) Legitimate nondiscriminatory reasons

Smolko listed in the EPR itself the several reasons for giving plaintiff the unfavorable performance review that he did. (EO3 Dennis J. Smolko, Employee Performance Review for Wendy R. McCartney (Feb. 13, 2007), Doc. 38-5, at 69, 70 (stating that McCartney "has little to no knowledge of the proper way to conduct routine inspections and small games of chance audits which are an essential function of the Bureau"); *id.* at 70 (noting her below-average performance in four areas, comparing her

42

against other officers during a time when McCartney was on full-duty status); *id.* (remarking that McCartney "has repeatedly demonstrated a hostile and critical attitude toward supervisory staff when attempts were made by them to communicate errors or deficiencies in her performance and offer corrective advice"); *id.* (describing McCartney as "display[ing] a lack of initiative, committed to doing only the minimum required to get by," and providing an example); *id.* at 71 (remarking on her "repeatedly demonstrated . . . unwillingness to work as part of a team").) Smolko also stated as much in his declaration. (Smolko Decl. ¶ 27, Doc. 38-5, at 65–66.)

These proffered reasons, which have been presented to the Court in forms that would be admissible as evidence at trial, would be sufficient, if believed by the trier of fact, to support a finding that the reason for plaintiff's performance review was not impermissible discrimination. The burden then shifts to plaintiff to show that these proffered reasons were pretextual.


(f) Pretext

The plaintiff may show pretext, and defeat a motion for summary judgment, with evidence "that would allow a fact finder reasonably to '(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action.'" *Sarullo*, 352 F.3d at 789, 799–800 (3d Cir. 2003) (quoting *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999)).

The plaintiff may make this showing in either of two ways. First, the plaintiff may show that the defendant's proffered reasons "are weak, incoherent, implausible, or so inconsistent that 'a reasonable factfinder could rationally find them unworthy of credence.'" *Id.* at 800 (quoting *Keller v. Orix Credit Alliance, Inc.*, 2130 F.3d 1101, 1108–09 (3d Cir. 1997)); *accord Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

43

Second, the plaintiff may provide "evidence that 'the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it could not have been the employer's real reason." *Id.* (quoting *Jones*, 198 F.3d at 413).

Although plaintiff makes no identifiable argument in her brief opposing summary judgment (Doc. 49) that the reasons for her negative EPR were pretextual, there is some attention given to the matter in her counterstatement of material facts (Doc. 50). She claims that Smolko's EPR lacks documentation and that he did not supervise her during the relevant rating period, and disputes the validity of the justification for the EPR. (Doc. 50, ¶ 232.) However, the cited portions of the record lend scant support to plaintiff's claims. She cited four documents: her notes on the EPR that Killion prepared (McCartney Notes, Doc. 48-9, at 22), which provides only ostensible excuses and explanations, but no documentary evidence that the EPR was groundless or incorrect; a printout of her record of leave from the BLCE (Overview of Absences for Wendy R. McCartney, Doc. 38-6, at 25–34); a report by LEO Burns on his investigation into The Spot, which notes that he did not enter The Spot on two visits because of known gang activity inside (LEO Christopher J. Burns, Administrative Investigation Report, June 3 & 17, 2006, Doc. 48-9, at 6–7); and further personal notes about the EPR that Smolko prepared (McCartney Notes, Doc. 48-3, at 16) that take issue with the basis for the negative evaluation, although the notes contain no date, have not been authenticated or verified, and have not, to the Court's knowledge, been discussed or corroborated in testimony.

In short, the documents that plaintiff cited do not imply that the proffered basis for the EPR was weak, incoherent, implausible, or internally inconsistent, or that the reasons cited in the EPR for the negative evaluation were so plainly wrong that they could not have been the real reasons for the unfavorable rating. She has not introduced evidence that her performance was actually better than Smolko indicated in the EPR; she merely made excuses, raised procedural objections, and attempted to minimize the significance

of the faults he found with her work. Plaintiff's caviling is unavailing, as merely "pointing to evidence that could convince a reasonable factfinder that [she] did as well as [she] could under the circumstances" is insufficient to defeat a summary-judgment motion. *Fitzpatrick v. Nat'l Mobile Television*, 364 F. Supp. 2d 483, 493 (M.D. Pa. 2005) (Munley, J.) (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997)). *See also id.* at 494 n.5 (citing *Billet v. CIGNA Corp.*, 940 F.2d 812, 826 (3d Cir. 1991), *overruled in part on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)) ("A plaintiff does not create a genuine issue of material fact that an employer's reliance on an incident is pretext by contesting the degree of the problem.")

(2) Hostile work environment

In order to establish a claim for a sexually hostile work environment, a plaintiff must show that "(1) [she] suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected [her]; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990) (citing *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 619–20 (6th Cir. 1986)). Because vicarious liability of the employer, here PSP, arises when "a supervisor with immediate (or successively higher) authority over the employee" creates a hostile work environment, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), actions by plaintiff's supervisors will be discussed and imputed, for present purposes, to defendant PSP.

Establishing whether there is a hostile work environment is often a complex inquiry, as "any analysis is filled with pitfalls and ambiguities. . . . [A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Id.* at 261 (quoting *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149 (3d Cir. 1999)) (internal

quotation marks omitted). However, "offhanded comments" and "isolated incidents (unless extremely serious)" are not sufficient to sustain a hostile-work-environment claim; rather, the "conduct must be extreme enough to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citing *Carrero v. N.Y. City Housing Auth.*, 890 F.2d 569, 577–78 (2d Cir. 1989); *Moylan v. Maries County*, 792 F.2d 746, 749–50 (8th Cir. 1986).

(a) Intentional discrimination because of sex

Establishing sexual discrimination does not mean that the offensive conduct is "necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female employee." *Andrews*, 895 F.2d 1469, 1485 (3d Cir. 1990). Put differently, a plaintiff need only show "that gender is a substantial factor in the discrimination, and that if the plaintiff 'had been a man she would not have been treated in the same manner.'" *Id.* (quoting *Tomkins v. Pub. Serv. Elec. & Gas Co.*, 568 F.2d 1044, 1047 n.4 (3d Cir. 1977)).

Plaintiff has alleged a litany of allegedly discriminatory activities, many of which are drawn from her February 2006 EEO complaint. In terms of sheer volume, most of the allegations are against Smolko, which are reviewed here. Smolko referred to the Altoona barracks as a "big male dormitory" where farting "occurred." He said that after plaintiff transferred in, they—presumably the male officers—had to watch what they say and do because "there is a 'girl' around." He had a Polaroid photograph on his office wall of a man in a penis costume. He held an office meeting on January 10, 2006 that only men were invited to. He also invited a group consisting entirely of male officers to a sports bar. In an office meeting on January 18, 2006, he said that the "girls," meaning the secretaries, wanted to say a few things. After Smolko announced a policy against use of personal cell phones in the office, a male office used his cell phone without immediate

reprimand. He was also involved in allegedly discriminatory car assignments, as discussed below.

The EEO complaint also contained allegations against Strobert and Killion. Strobert had forwarded to several officers, including plaintiff, an article about Transue, a female officer who was fired and then rehired, and made a follow-up comment about how he would do the same but would be unable to get away with it because he was male, not female. He also forwarded by email to several officers, including plaintiff, an article from a 1955 issue of Good Housekeeping entitled "The Good Wife's Guide," which described a number of submissive techniques that a wife was advised to follow to please her husband. Finally, Strobert explained his decision not to invite plaintiff to a Christmas party or a farewell party in 2005 by saying that "the guys didn't want [him] to invite [her]."

The sole allegation in the EEO complaint against Killion was that he had asked McCartney to say goodbye when she was leaving the office. It is undisputed, however, that this request was repeated to the office as a whole in an office-wide meeting just days later. Plaintiff describes the announcement at the meeting of the "goodbye" policy as an attempt to cover up Killion's discriminatory behavior, but there is no evidence in the record to support this claim other than plaintiff's own suppositions.

Plaintiff avers that she was never offered a new car to use in the field as an LEO. She says she was given only "hand-me-downs that were left over." Defendants dispute this claim; Hawk stated that she was offered a brand-new Honda Accord, but she chose to keep the Ford Focus she was driving. Also, while Smolko was the officer in charge of vehicle assignments, he gave her a choice between a Malibu and a Grand Am. Later, in October 2008, after asking for a new Sebring to help her back, she was denied, but offered the next day a large Monte Carlo that vehicle officer Bush suggested might help her back as well.

Even assuming that plaintiff's version of the facts is correct, the car-assignment matter does not suggest sexual discrimination. Plaintiff has introduced no evidence that she had any entitlement to an assignment of a new car, that it was standard practice for males to be assigned new cars, or that other officers using cars had more or better choices than she did.

As for other activity not addressed in the EEO complaint, plaintiff refers to five visits that Strobert made back to the Altoona office after he was transferred to Lewistown, visits that plaintiff alleged were "just to harass her more." But there was no mention of any conversation or interaction with him, except for one occasion on which he greeted her but she ignored him. Plaintiff also describes as discriminatory her being assigned to a case in which Strobert was the complainant; however, the only contact with Strobert that the assignment would have required was for her to send him an email at the completion of the investigation, as initial contact had already been made. There is no evidence in the record that McCartney's prior complaint about Strobert was a sufficient reason for her to have been excused from any work assignment that might bring her into contact, however indirect or fleeting, with Strobert, or that the plaintiff's assignment to that case was a result of anything except an attempt to evenly distribute the department workload.

In May 2006, plaintiff complained to Butler that Killion was discriminating against her by making her, but not men, comply with contractual travel times that determined when, relative to the end of a shift in the field, an employee could return home. Butler spoke to Hawk, who investigated; he determined no pattern of abuse, but noted some "minor individual violations/discrepancies" and counseled individual officers. There is no evidence that male officers were, in fact, allowed to sign off sooner than the contractual travel-time provisions allowed.

Plaintiff reported the use of profanity within her hearing distance as an example of discrimination against her, it being known that such language was offensive to her, but

did not mention a single instance in which the profane language was directed at her or used in a sexual manner.

Nearly all of the foregoing activity can be explained in gender-neutral terms. For many of plaintiff's complaints—the "goodbye" policy, the car assignments, Strobert's visits and the assignment to one of his cases, the travel times—there is no evidence that males were treated any differently from the way that she was, other than plaintiff's own feeling of being persecuted; in the case of the profane language, there is no evidence that other officers' choice of words had anything to do with plaintiff.

But some of the conduct by Smolko and Strobert described in the February 2006 EEO complaint does have clear overtones of sex or gender and betrays a possible discriminatory animus. Smolko's photograph of a man in a penis costume, his reference to women as "girls," and his description of the Altoona barracks as a "big male dormitory" where farting "occurred" all constitute conduct in which gender is a "substantial factor" and suggest that if plaintiff "had been a man," she may have been treated differently. Likewise with the news articles that Strobert emailed; these articles, combined with his commentary, could have a disproportionately negative psychological or emotional impact on a woman as opposed to a man.


(b) Pervasiveness and regularity of the discrimination

Relevant factors in analyzing the circumstances of employment may include "the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Previously, it had been held incumbent upon the plaintiff to establish "the existence of a hostile or abusive *environment* which is severe enough to affect the psychological

stability of [an] employee," *id.* (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990)), but the Supreme Court has held that as long as the work environment "would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious," *Harris*, 510 U.S. at 371 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

Plaintiff has provided little in the way of an element-by-element analysis of any of her claims, including the hostile-work-environment claim, in terms of either facts or law. She submitted no counterstatement of material facts; she responded only to plaintiff's statement of facts, and so plaintiff has not given the Court the benefit of an organized discussion of the materials in the record that support her claim. Her brief opposing summary judgment contains little in the way of citations to the record other than string citations; in the section that primarily discusses hostile work environment, she gives a string citation to her response to defendants' statement of material facts, which in many cases refer to paragraphs that have no support in the record, refer to conduct that allegedly constitutes retaliation, or cite testimony that corresponds to allegations in plaintiff's February 2006 EEO complaint. (Doc. 49, at 20 (citing Pl.'s Resp. to Def.'s Stmt. of Material Facts, Doc. 50, at ¶¶ 232, 248, 250, 256, 258, 261, 262, 264, 90, 76, 25, 63, 61, 19, "among others").) Others refer to plaintiff's personal notes that purport to demonstrate favoritism toward male LEOs. (*See, e.g.*, Pl.'s Exh. 28, Doc. 48-9, at 28 (listing alleged violations of law and regulations by male officers); Pl.'s Exh. 32, Doc. 48-10, at 3 (reviewing an incident in which plaintiff's request to attend a training session was denied).) Plaintiff's brief in opposition to summary judgment otherwise offers little other than terse conclusions that she believes she has established or that she wishes the Court to adopt. (*See, e.g.*, Doc. 49, at 20 ("It seems quite obvious that plaintiff meet[s] the requirements laid down by our courts that are necessary to make out a Title VII hostile work environment claim.").)

Aside from the laundry list of events recorded in plaintiff's notes, the primary chronology comes from the February 2006 EEO complaint, discussed above, which details occurrences from August 2005 until the beginning of February 2006. The conduct described therein over a six-month period includes occasional instances of sexually insensitive or perhaps sexually derogatory sentiment, but does not rise to the level of frequency and severity necessary to establish that the conduct was regular and pervasive. Nothing that any of the officers did was physically threatening, no derogatory comments were directed toward plaintiff, and none of it occurred on a regular basis. Strobert may have behaved tastelessly when he commented about Transue's firing and rehiring, as well as when he sent out the Good Wife's Guide, but he sent these emails to several recipients of both genders, his wife was a recipient of the email forwarding the Good Wife's Guide, and he did not target plaintiff in any way. Somewhat similiarly, it may have been a poor decision for Smolko to display in his office a photo of a man in a penis costume, and for Strobert to be telling stories about how women are less courteous than men, but this seems, at worst, to evidence intermittently boorish behavior directed at no one in particular. The rest of the EEO complaint consists largely of the following: a description of plaintiff's feelings of being singled out for enforcement of a policy on cell-phone use and on notifying supervisors upon departure from the office, and although she cites one occasion on which another officer used a cell phone without immediate reprimand, she cites no instances of either policy being enforced against her; a single instance in which she was allegedly excluded from an office meeting on January 10, 2006; Smolko's use of the term "girls" to refer to the secretaries, and his description of the Altoona barracks as a "big male dormitory"; plaintiff not getting what she considered to be a desirable car

assignment; and plaintiff's feeling of being excluded because she was not invited to several social gatherings taking place outside of work hours.[32]

The present case bears some similarity to *Sherrod v. Philadelphia Gas Works*, 57 F. App'x 68 (3d Cir. 2003), in which the plaintiff, Sherrod, sought to establish a hostile work environment based on racial discrimination. Sherrod's superiors made two comments that could have been interpreted as racially derogatory, but no one ever referred to her using racial slurs. *Id.* at 77. One of Sherrod's reports was thrown away, she was excluded from one meeting, and a colleague told a clerk not to listen to Sherrod. *Id.* The court compared the treatment that Sherrod received to the treatment received by the plaintiff in the landmark case of *Cardenas v. Massey*, 269 F.3d 251 (3d Cir. 2001):

> In *Cardenas*, the defendants subjected the plaintiff to ethnic slurs, dealt with disagreements by asking if the plaintiff intended to pull out a switchblade, wrote derogatory messages on the marker board in the plaintiff's cubicle, rounded the numbers on all other employees' evaluations upward while rounding the plaintiff's evaluation numbers downward, disproportionately assigned minorities and trainees to the plaintiff's unit, gave plaintiff contradictory instructions and assignments incompatible with his staff resources, and spread the word that plaintiff was an affirmative-action hire.

*Sherrod*, 57 Fed. Appx. at 76 (citing *Cardenas*, 269 F.3d 258–59). The *Sherrod* court concluded that the plaintiff had failed to establish conduct rising to the level of severity or pervasiveness found in *Cardenas*.

---

[32] In discussing these incidents separately, the Court remains mindful of its duty to "evaluate the sum total of abuse over time" rather than "consider each event in isolation." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 155 (3d Cir. 1999) (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1484 (3d Cir. 1990)). The purpose of the piecemeal discussion is not to explain away each incident one by one but to emphasize that the individual occurrences were not "extremely serious." *Caver v. City of Trenton*, 420 F.2d 243, 262 (3d Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

As in *Sherrod*, plaintiff was exposed to—but not the target of—a limited number of comments and statements that could be interpreted as derogatory toward women. Whereas Sherrod was excluded from a meeting, had a report thrown away, and had a coworker tell a clerk not to listen to her, here plaintiff was also excluded from a meeting, was not given a car she found desirable or permission to attend a training session, and made note of lax enforcement of certain policies around the office. Aside from Strobert's comments and emails and Smolko's use of the term "girls," all of the behavior to which plaintiff objects has a gender-neutral explanation. And it is undisputed that plaintiff was never subjected to the kind of abusive treatment described in *Cardenas*.

Although certain behavior by plaintiff's supervisors may have made her uncomfortable or otherwise have been not to her liking, there is no reasonable basis in the evidence to support a conclusion that this behavior created a workplace "permeated with 'discriminatory intimidation, ridicule, and insult' . . . 'sufficiently severe or pervasive enough to alter the conditions of the victim's employment.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Simply put, Title VII is not "a general civility code," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), and no employee has a right to an idyllic workplace free from everything bothersome.

(c) Remaining elements of a hostile-work-environment claim

A plaintiff seeking to establish a hostile work environment must also produce evidence that the discrimination both detrimentally affected her and would have detrimentally affected a reasonable person of the same sex in the same position, and that there is a basis for vicarious liability. *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990) (citing *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 619–20 (6th Cir. 1986)).

Plaintiff has produced some evidence that she was detrimentally affected by the treatment that she received.[33] (*See* Doc. 50, at ¶ 110 (citing McCartney Dep. 365:6–10, Doc. 38-4, at 61) (recalling that "the atmosphere around the office actually got worse instead of better" after filing her EEO complaint in February 2006); *id.* at ¶ 200 (citing McCartney Dep. 107:11–108:16, Doc. 38-2, at 65–66) (stating that she felt "backed into a corner" and "trapped with nowhere to go," and explaining that she filed a number of complaints against her supervisors because she was "looking for relief from the stress that [she] had to go through every day"); *id.* at ¶ 256 (citing McCartney Notes, Doc. 48-10) (indicating that she visited a psychologist because of stress at work); Steven Hand, M.A., Intake Summary for Wendy McCartney, Nov. 9, 2006, Doc. 38-12, at 86 (noting that McCartney felt "mistreated by colleagues" and reported tightness in her chest, anxiety, and worry, among other symptoms).) However, there is no basis for a conclusion that a reasonable person would have been similarly detrimentally affected in her position. Plaintiff presented neither evidence nor argument on the subject. Nothing in the record suggests that the sort of banal, everyday annoyances that constitute the bulk of plaintiff's grievances were so extreme that a reasonable person would have suffered a detrimental effect significant enough to amount to a change in the terms and conditions of employment.

Although there is a basis for holding PSP liable for the actions of plaintiff's supervisors, plaintiff's hostile-work-environment claim otherwise suffers from several fatal deficiencies, which compel the conclusion that this claim must fail.

---

[33] Despite the matter of detrimental effect receiving some attention in the statements of material facts, plaintiff did not address this topic in her brief opposing summary judgment.

## (B) Retaliation: Section 1983 and the First Amendment

Section 1983 creates no substantive rights, but rather provides a remedy for infringement of rights established by other federal laws. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("[Section] 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere . . . ."). The statute provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C.A. § 1983 (West 2010). Recovery under § 1983 requires proving that "a person acting under color of state law" deprived the plaintiff of a "right secured by the Constitution and the laws of the United States." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)).

A claim brought under § 1983 is governed by the personal-injury statute of limitations of the state in which the cause of action accrued. *O'Connor v. City of Newark*, 440 F.3d 125, 126 (3d Cir. 2006) (citing *Cito v. Bridgewater Twp. Police Dep't*, 892 F.2d 23, 25 (3d Cir. 1989). Pennsylvania's statute of limitations for personal injuries is two years. 42 Pa. Cons. Stat. Ann. § 5524.

Defendants argue that the two-year statute of limitations bars any possibility of recovery for acts that occurred before September 21, 2007, two years before the complaint was filed on September 21, 2009. Plaintiff makes a conceptual distinction between "discrete" and "indiscrete" acts and maintains that indiscrete acts "tack" (in an apparent reference to the law governing adverse possession), implying that the complained-of acts here are indiscrete, which would allow her to recover for pre-

September-2007 acts. But in the context of a claim for retaliation, plaintiff's position is inconsistent with Supreme Court and Third Circuit precedent.

In 2002, the Supreme Court determined that the mere occurrence of at least one act within the relevant statutory period would not allow "discriminatory and retaliatory acts that are plausibly or sufficiently related to that act" to be considered for the purposes of liability. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). Unlike a hostile-work-environment claim, which "is designed explicitly to address situations in which the plaintiff's claim is based on the cumulative effect of a thousand cuts," the discrete acts that form the basis of a retaliation claim "do not make timely acts that fall outside" of the two-year statutory period. *O'Connor*, 440 F.3d at 128; *Morgan*, 536 U.S. at 112.

Accordingly, plaintiff may only base her claims on acts by defendants that occurred on or after September 21, 2007, although the prior acts may be used as "background evidence in support" of her claim. *Morgan*, 536 U.S. at 113.

Succeeding on a theory of retaliation for the exercise of First Amendment rights requires a plaintiff to establish that (1) she engaged in protected speech, (2) the defendants took adverse action "sufficient to deter a person of ordinary firmness" from exercising her First Amendment rights, and (3) the adverse action was prompted by the plaintiff's protected speech. *Wilson v. Zielke*, 382 F. App'x 151, 153 (3d Cir. 2010) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)). The employer "may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct." *Hill v. City of Scranton*, 411 F.3d 118, 126 (3d Cir. 2005) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

(1) Protected speech

Protected speech is speech "on matters of public concern." *Connick v. Myers*, 461 U.S. 138, 145 (1983). If the speech that allegedly led to retaliation is not a matter of public concern, "it is unnecessary for [a court] to scrutinize the reasons" for the defendants' acts in question. *Id.* at 146. Whether the speech is a matter of public concern "must be addressed by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147.

There are three instances of speech that plaintiff claims triggered retaliatory acts by defendants:[34] first, her February 2006 EEO complaint alleging sexual discrimination; second, the complaint that she sent to Maj. Skurkis about Hawk driving a car on December 8, 2006, with an expired inspection sticker; and third, her complaint about the use of state cars to drive to Olive Garden on December 12, 2006. Upon review of the applicable case law, it is apparent that none of these communications constitutes speech on a matter of public concern.

It is true that a complaint by an employee about sexual harrassment can constitute a matter of public concern. *Hartley v. Pocono Mountain Reg'l Police Dept.*, No. 04-2045, 2006 WL 4389589, at *17 (M.D. Pa. May 17, 2006) (citing *Azzaro v. County of Allegheny*, 110 F.3d 968, 978–79 (3d Cir. 1997)). However, in both *Hartley* and *Azzaro*, a key component of the courts' conclusions was that the complaints in question were "relevant to the public's perception of an elected official's job performance." *Id.* (discussing *Hartley*); *id.* at *16 (finding that the plaintiff showed that "her complaints, verbal and written, involved her belief of systematic sexual harrassment and discrimination" at the police department, and noting that "the public and citizens . . .

---

[34]Plaintiff also filed a PHRC complaint against the PSP on May 2, 2006, but nothing in plaintiff's exhibits, briefs, or response to plaintiff's statement of material facts link the PHRC complaint to any retaliatory acts.

would be concerned" if the police "discriminate[d] against employees due to their gender"); *Azzaro*, 110 F.3d at 970, 978 (discussing an incident involving unwelcome sexual advances by a county commissioner, the complaint about which "brought to light actual wrongdoing on the part of one exercising public authority that would be relevant to the electorate's evaluation of the performance of the office of an elected official"). In this case, with regard to plaintiff's EEO complaint, there are no such implications about public performance or "the process of self-governance." *Azzaro*, 110 F.3d 969. Instead, plaintiff "complained solely about [her] own 'abuse' and mistreatment by superiors and coworkers." *Bell v. City of Phila.*, 275 F. App'x 157, 159 (3d Cir. 2008). *See Sanguigni v. Pittsburg Bd. of Pub. Educ.*, 968 F.2d 393, 399 (3d Cir. 1992) (citing *Gaj v. U.S. Postal Serv.*, 800 F.2d 64, 67 (3d Cir. 1986)) (discussing *Gaj*, in which the court held an employee's complaints about safety matters and working conditions not to relate to matters of public concern because "the complaints were not made to protect the interests of other employees but only to protect the interests of the complaining employee himself"). The contents of the EEO complaint itself, as well as plaintiff's testimony on the matters alleged therein, make it clear that plaintiff's only concern was her own perceived harassment. Nothing in the EEO complaint intimated a wider pattern of inappropriate conduct; her consistent suggestion was that she was the sole target of discrimination by other officers at the PSP. On every matter discussed therein—Smolko's comments, the emails that Strobert sent, the use of profanity—plaintiff made it clear that she and she alone was offended, and never implied any broader significance to the behavior that she recounted. And, unlike the unwelcome sexual advances by the county commissioner in *Azzaro*, the behavior described in the EEO complaint does not "bring to light actual wrongdoing . . . that would be relevant to the electorate's evaluation of the performance" of an elected official. *Azzaro*, 110 F.3d at 970.

It may be more straightforwardly established that the remaining two matters—the inspection-sticker complaint and the Olive Garden complaint—are not of public concern. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006). McCartney gave two reasons for submitting these complaints: first, she believed she was required to report them, and second, she was "looking for relief from the stress that [she] had to go through every day," and hoped that by filing these complaints, someone would "listen to what [she] was saying and just hear [her]." (McCartney Dep. 107:11–108:16, Doc. 38-2, at 65–66.) Neither of those reasons evinces a public concern. The first reason is an admission that she was making a statement that she believed was pursuant to her official duties; the second is an admission that her concern was entirely private in character.

(2) Acts of deterrence and causal connection

The conclusion in the preceding section that plaintiff's speech was not protected is dispositive in the analysis of her retaliation claim. Nonetheless, some attention will be given to the question of whether defendants' acts satisfy the second and third elements of retaliation.

Because the Pennsylvania statute of limitations operates to bar plaintiff from basing her claim on acts by defendants before September 21, 2007, she may rely only on the following: Smolko's "f-ing Barney" comment in April 2008; a visit by Strobert to the Altoona office on December 1, 2008, when he said hello to plaintiff but she ignored him; the denial of plaintiff's requests for a new car in February and October 2008; and her allegedly constructive discharge in December 2008.

The record does not contain evidence that would reasonably support a conclusion that "a person of ordinary firmness" would be deterred from any particular kind of conduct by the first three acts described above. An offhand comment that plaintiff admitted was not direct at her, a visit to the office during lunch time by another officer that resulted in no significant contact between plaintiff and that officer, and a denial of an administrative request are such minor incidents as to be insignificant. *See Hoffman v. Dougher*, No. 05-0906, 2008 WL 148877, at *10 (M.D. Pa. 2008) (Conner, J.) ("Retaliatory acts must be 'more than *de minimis* or trivial' to have an adverse effect on employee's First Amendment rights." (quoting *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003))). Further, there is simply nothing in the record that suggests any connection between plaintiff's activity and these allegedly retaliatory acts. Plaintiff has admitted that defendants' acts "only temporally connect" with plaintiff's activity (Doc. 49, at 17), and "temporal proximity alone [is] insufficient to establish the necessary causal connection when the temporal relationship is not 'unusually suggestive.'" *Cardenas v. Massey*, 269 F.3d 251, 264 (3d Cir. 2001) (quoting *Farrell v. Planters Lifesavers Co.*, 205 F.3d 271, 280 (3d Cir. 2000)). Here, the temporal relationship is hardly "unusually suggestive"; the acts by plaintiff and defendant are separated by a matter of months to years, and there is no other contextual evidence to substantiate a link between, say, the February 2006 EEO complaint and Smolko's April 2008 profane reference to Barney.

As for plaintiff's departure from the PSP in December 2008, she admitted that she retired because of back and foot problems. Although plaintiff introduced some evidence that she sought an ADA accommodation for her disability and was denied, she did not introduce evidence that the PSP could have reasonably provided such an accommodation or that, consequently, the PSP was in error to deny the accommodation. Further, there is no ADA issue before the Court, no basis for undertaking a substantive review of the PSP's denial of plaintiff's ADA request, and no reason to question plaintiff's own cited

reasons for her retirement. The record quite simply shows that plaintiff would have left the PSP when she did regardless of any alleged retaliation from defendants; she left of her own accord, citing disability, and began collecting disability benefits on this basis.

### (C) Constructive discharge

A plaintiff may establish a claim for constructive discharge if "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 155 (3d Cir. 1999) (quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888–89 (3d Cir. 1984)). For all the reasons discussed in analysis of the hostile-work-environment claim, *see* Part III.A.2 *supra*, plaintiff has failed to establish that her working conditions were so severely unpleasant or difficult as to constitute a constructive discharge. *See Clayton v. Pa. Dep't of Pub. Welfare*, No. 05-0768, 2007 WL 5785677, at *13 (M.D. Pa. Feb. 20, 2007) (Jones, J.) (noting that failure to establish a hostile work environment necessitates failure of a constructive-discharge claim). Further, as discussed in the preceding paragraph, plaintiff cited foot and back injuries when she retired and so received disability-retirement income. She cannot ignore her own behavior and claim *post hoc* that she left her position for some other reason.

### (D) Qualified immunity

The individual defendants have asserted the affirmative defense of qualified immunity, which is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The risk of losing this entitlement indicates the importance of resolving questions of qualified immunity as early as possible in the litigation.

There are two inquiries that a court must make in determining whether a defendant is entitled to qualified immunity. One is whether the facts as alleged in the complaint make out a violation of a constitutional right.[35] *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second question is whether "the right was clearly established . . . in light of the specific context of the case." *Id.* Although the Supreme Court had until recently required that these two questions be addressed strictly in the order presented, this requirement has been relaxed, and lower courts may now "exercise their sound discretion in deciding which of the two prongs of the qualified-immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815–17 (2009).

Qualified immunity serves as a shield from suit if a defendant official could have reasonably believed that the actions in question were lawful in light of clearly established law and the information the defendant possessed at the time. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson*, 483 U.S. at 641). Officials who "reasonably but mistakenly" conclude that their actions were lawful are still entitled to immunity. *Id.* This standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 229 (citing *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

Plaintiff has raised two constitutional issues in this case: retaliation for exercise of her First Amendment rights and gender-based discrimination in violation of her rights under the Equal Protection Clause of the Fourteenth Amendment. As discussed in the preceding sections of this Report and Recommendation, the evidence of record regarding acts that remain actionable—that is, acts for which the limitations period has not yet passed—does

_____

[35] Since, in this case, discovery has been completed and the pending motion is for summary judgment rather than dismissal, the proper source of factual material is plaintiff's well-supported citations to the record.

not make out a violation of either constitutional right. When Smolko told plaintiff in February 2008 that he was no longer the automotive officer and could not grant plaintiff's request for a new car, he could reasonably have believed that he was making an administrative decision withing the bounds of then-existing law. Smolko's swearing in April 2008, although perhaps crass, he may reasonably believed to have been legal; similarly, Strobert could reasonably have believed that he was not violating plaintiff's constitutional rights when he visited his prior place of work and greeted plaintiff upon seeing her. Finally, to the extent that any individual defendant may have participated in plaintiff's retirement in 2008 on the basis of disability—in which the defendants could have participated only to the extent that they accepted her resignation—they could reasonably have believed that they were not violating plaintiff's constitutional rights by allowing her to resign and begin receiving disability benefits. In short, the evidence that plaintiff has proffered is insufficient to defeat the individual defendants' claim to qualified immunity.

## IV. Conclusion

Based on the foregoing discussion, it is recommended that defendants' motion for summary judgment be GRANTED, and plaintiff's complaint be DISMISSED.

s/ William T. Prince
William T. Prince
United States Magistrate Judge

March 3, 2011