IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WENDY McCARTNEY,** | : | **No. 1:09cv1817** |
| **Plaintiff** | : | **(Judge Munley)** |
| **v.** | : | |
| **PENNSYLVANIA STATE POLICE, DANIEL HAWK, DENNIS SMOLKO, EARL KILLION, CHARLES STROBERT, THOMAS BUTLER, and PATRICK GEBHART,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Before the court for disposition are the plaintiff's objections to the magistrate judge's report and recommendation which proposes that the defendants' motion for summary judgment be granted and that the plaintiff's complaint be dismissed. The objections have been briefed and are ripe for disposition.

## BACKGROUND[1]

This case involves claims against individual officers of the Pennsylvania State Police ("PSP") and the PSP itself, brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and, via 42 U.S.C. § 1983, the Equal Protection Clause of the Fourteenth Amendment

---

[1] The court largely adopts and incorporates the background section of Magistrate Judge William T. Prince's report and recommendation. (See Report & Recommendation; Doc. 57, at 1-30). We do so noting generally that the plaintiff does not object to the accuracy of the magistrate judge's statement of the facts of the case, but only disagrees with the magistrate judge's evaluation of the facts in relation to the legal standard on a motion for summary judgment. In several instances, we have added facts which the plaintiff referred to in opposing the motion for summary judgment.

and a theory of retaliation under the First Amendment.

## (A) Facts of the case

For the most part, the events relevant to this case took place between April 2005 and December 2008, when Plaintiff Wendy McCartney ("McCartney") worked at the Altoona District Office of the Pennsylvania Bureau of Liquor Control and Enforcement ("BLCE"), a division of the PSP.

### (1) The parties

#### (a) Wendy McCartney

Plaintiff Wendy McCartney ("McCartney") began working for the PSP as a Liquor Enforcement Officer (LEO) in the Philadelphia office of the BLCE.  (Doc. 37, ¶ 11; Doc. 50, ¶ 11).  She transferred to the Pittsburgh office in 2003.  (Doc. 37, ¶ 14; Doc. 50, ¶ 14).  While in Pittsburgh, McCartney worked with Defendant Dennis Smolko ("Smolko").  (Doc. 37, ¶ 15; Doc. 50, ¶ 15).

On or about April 25, 2005, McCartney transferred from the Pittsburgh District Office to the Altoona District Office of the BLCE.  (Doc. 37, ¶ 22; Doc. 50, ¶ 22).  Shortly after she moved to Altoona, she was in a car accident and went on medical leave "for a considerable part of 2005." (McCartney Dep. 39:13–18, May 19, 2010, Doc. 38-2, at 32).  Records indicate that she had four extended periods of absence: April 28, 2005 to July 22, 2005 (62 days); September 1, 2005 to January 3, 2006 (89 days); September 24, 2007 to December 28, 2007 (70 days); and May 5, 2008 to July 11, 2008 (50 days).  (McCartney Dep. 181:4–186:14, Doc. 38-3, at 14–19; Overview of Absences for Wendy R. McCartney, Doc. 38-6, at 25–34).  At some point, McCartney requested an Americans with Disabilities Act ("ADA") accommodation, but her request was denied. (McCartney Dep. 16:17–20, Doc. 38-2, at 16).

#### (b) Daniel Hawk

2

Defendant Daniel Hawk ("Hawk") was a sergeant in the PSP and was the District Office Commander ("DOC") in the Altoona District from February 13, 2006, until his retirement on January 12, 2007.  (Hawk Decl. ¶ 1, Aug. 8, 2010, Doc. 38-6, at 10; McCartney Dep. 96:21–97:5, Doc. 38-2, at 59–60; *id.* 134:9–14, Doc. 38-2, at 89).  According to Hawk, upon transferring to Altoona, he had a meeting with all office staff, including McCartney, and told staff that profanity would not be tolerated.  (Hawk Decl. ¶ 4, Doc. 38-6, 2 at 11).

### (c) Dennis Smolko

Defendant Dennis Smolko ("Smolko") was an Enforcement Officer 3 ("EO3") with the BLCE and has held that position until the present time. (Smolko Decl. ¶ 1, Aug. 25, 2010, Doc. 38-5, at 60).  Smolko stated that he was McCartney's direct supervisor from March 2004 to July 2004 in the Pittsburgh District Office.  (Id. ¶ 2).  McCartney states that she has no memory of him being her supervisor. (McCartney Dep. 25:7–16, Doc. 48-2, at 6).

### (d) Earl Killion

Defendant Earl Killion ("Killion") was an LEO for the PSP BLCE who worked at the Altoona office. (Doc. 37, ¶ 33; Doc. 50, ¶ 33).  For a time in 2006 and 2007, he was an Acting EO3.  (Id.)  He has worked at the Altoona office from 1996 until the present.  (Killion Decl. ¶ 1, Aug. 2010, 4 Doc. 38-6, at 37).

### (e) Charles Strobert

Defendant Charles Strobert ("Strobert") was a sergeant in the PSP. (Strobert Decl. ¶ 1, Aug. 2010, Doc. 38-6, at 59).  Until January 8, 2006, he was the District Office Commander ("DOC") in the Altoona district; he was

then transferred to the Lewistown PSP barracks.[2]  (Id.)

### (f) Thomas Butler

Defendant Thomas Butler ("Butler") was a captain with the PSP in the BLCE and was then the Director of Operations.  (Butler Decl. ¶ 1, Aug. 25, 2010, Doc. 38-7, at 7; McCartney Dep. 380:7–15, Doc. 38-4, at 69). From January to March 2009, Butler worked in Harrisburg as the Director of Administration for the BLCE.  (Id.)  While there, he was also the Equal Employment Opportunity ("EEO") Liaison.[3]  (Id.)

### (g) Patrick B. Gebhart

Defendant Patrick B. Gebhart ("Gebhart") was a captain in the PSP BLCE and was the Director of Administration for the BLCE.  (Gebhart Decl. ¶¶ 1–2, Aug. 2010, Doc. 38-8, at 7–8).  He began with BLCE in March 2007 as Director of Operations.  (Id.)  He worked in Harrisburg at all times he was with the BLCE.  (Id.; McCartney Dep. 403:11–13, Doc. 38-4, at 83).

### (h) Thomas Mannion[4]

Thomas Mannion was an EO3 with the BLCE.  (McCartney Dep. 114:2-3; Doc. 38-2, at 71)  He was a supervisor to McCartney when McCartney transferred to Altoona.  (McCartney Dep. 73:21-25; Doc. 48-2, at 19).  McCartney had heard from a female officer in Pittsburgh that Mannion had picked on her.  (Id. 75:1 to 76:1).  Mannion used the word

---

[2] Plaintiff "neither admitted nor denied" these statements and made no reference to the record.  (Doc. 50, ¶ 34).

[3] Plaintiff denied these statements without reference to the record. (Doc. 50, ¶ 35).

[4] As described below, Mannion was dismissed with prejudice on July 28, 2010, upon plaintiff's request.  (Doc. 33).  We list Mannion as a party here to make the background more clear.

4

"bitch" frequently, and used it in reference to a female secretary once in McCartney's presence.  (Id. 183:24 to 184:14).  Mannion told McCartney that he had driven to her house and pulled into her driveway and turned around.  (Id. 77:11 to 78:24; 183:10-12).  Mannion told McCartney that he had been watching her from a window as she walked from the parking lot.  (Id. 183:4-9).  Mannion told her that a judge would like her because she was a woman.  (Id. 183:12-23).

### (2) The February 2006 EEO complaint

On February 9, 2006, McCartney submitted an internal EEO complaint to Butler.  (Doc. 37, ¶ 43; Doc. 50, ¶ 43; Wendy R. Macknair[5], Complaint Regarding Hostile Work Environment (Feb. 9, 2006), Doc. 38-8, at 16 [hereinafter "EEO Complaint"]).  The complaint alleged that McCartney was subject to a hostile work environment and disparate treatment (Doc. 37, ¶ 44; Doc. 50, ¶ 44), and included numerous allegations against Mannion, Smolko, Strobert, and Killion, as well as allegations that a number of officers were using offensive, profane language. (See Doc. 37, ¶¶ 46a–77; Doc. 50, ¶¶ 46a–77).

### (a) Allegations against Mannion

The EEO complaint alleges that in May 2005, Mannion came to her residence uninvited, pulling into her driveway and turning around; and in August 2005, Mannion watched McCartney in the parking lot and then told her he had done so, and said that an administrative law judge would like her because she is female.  (EEO Compl. ¶¶ 8–10, Doc. 38-8, at 17–18). McCartney also believed that there "may be a potential for [Mannion] to

---

[5] Some of the documents in the record show the plaintiff's name as Wendy Macknair.  At some point in 2005 or 2006 plaintiff changed her name back to McCartney.  (McCartney Dep. 1:12 to 2:4, Doc. 48-2, at 1).

create a hostile work environment" because another female employee said that Mannion "mistreated" her and because of a male LEO who, in 2002, was "constantly complaining about how [Mannion] mistreated him." (Doc. 37, ¶ 45a; Doc. 50, ¶ 45a; EEO Complaint ¶¶ 4–6, Doc. 38-8, at 17).

### (b) Allegations against Smolko

In August 2005, Smolko told McCartney that the squad room was a "big male dormitory" and in the past, foul language was used and "farting occurred." (Doc. 37, ¶ 46a; Doc. 50, ¶ 46a; EEO Compl. ¶ 12, Doc. 38-8, at 18).  He told her that he and the other male officers felt "that since there is a 'girl' around, they can't do that and have to watch what they say and do around [her]." (Doc. 37, ¶ 46b; Doc. 50, ¶ 46b; EEO Compl. ¶ 12, Doc. 38-8, at 18).

On January 10, 2006, Smolko convened a meeting in the DOC's office and invited the male LEOs.  (EEO Complaint ¶ 23, Doc. 38-8, at 20–21).  He told "these male [LEOs] (Burn's [sic], Butler, maybe Salmon, not Coble or Bell, etc.)" about certain administrative changes being made. (Id.)  McCartney was not invited to the meeting.  (Id.)

On January 18, 2006, Smolko invited Burns and other LEOs to a sports bar to watch a football game on Sunday, but he did not invite McCartney, even though she expressed interest.  (Doc. 37, ¶ 46d; Doc. 50, ¶ 46d; EEO Complaint ¶ 24, Doc. 38-8, at 21).  McCartney did not ask to be invited to the sports bar and did not know whether they actually went to the sports bar.  (McCartney Dep. 217:5–10, Doc. 38-3, at 43).

During an office meeting also on January 18, Smolko stated that the "girls," referring to the secretaries, wanted to say a few things.  (Doc. 37, ¶ 46e; Doc. 50, ¶ 46e; EEO Complaint ¶ 25, Doc. 38-8, at 21).  McCartney was bothered by women being referred to as girls.  (McCartney Dep. 51:14 to 52:13, Doc. 48-6, at 13).  According to McCartney, one of the

secretaries objected to being referred to as a girl and indicated that she wanted to be referred to as a lady.  (Id.)  According to McCartney, this was only one occasion of multiple ocassions when Smolko referred to women as girls.  (McCartney Dep. Day 2 177:4-11, Doc. 48-6, at 45).

During the same meeting, Smolko stated that cell phones were not to be used at the office; the next day, another LEO, Jeffrey Butler—a different person from Captain Butler—used his cell phone in the office, which Smolko witnessed but did not comment on.  (Doc. 37, ¶ 46f; Doc. 50, ¶ 46f; EEO Compl. ¶ 27, Doc. 38-8, at 21–22).  Butler was calling Bell, who was on the road working and needed assistance with directions. (McCartney Dep. 219:3–10, 221:1–3, Doc. 38-3, at 45, 47).  McCartney admits that personal cell-phone usage was "excessive," as Smolko said it was. (Smolko Decl. ¶ 6, Doc. 38-5, at 61; Doc. 50, ¶ 62).  McCartney states that she was challenged about taking a personal call on her cell phone during her break-time, but never saw the policy enforced against male officers.  (McCartney Dep. 132:13 to 135:12, Doc. 48-2, at 33-34). McCartney cannot directly prove that male officers were never reprimanded for using their cell phones at work but makes her inference from the fact that she never saw male officers counseled about cell phone use the way she was and from the fact that male officers continued to use their cell phones throughout the day around the time she was counseled.  (Id. 135:2-12, Doc. 48-2, at 34).

On January 23, 2006, McCartney was brought into Smolko's office and on the wall she saw a Polaroid photo of a man in a penis costume. (Doc. 37, ¶ 46g; Doc. 50, ¶ 46g; EEO Complaint ¶ 29, Doc. 38-8, at 22). McCartney submitted a copy of the polaroid to Captain Butler.  (Doc. 37, ¶ 49; Doc. 50, ¶ 49).  McCartney never saw any sexually inappropriate photographs in the workplace after Butler's investigation.  (McCartney

Dep. 129:23–25, Doc. 38-2, at 85; id. 229:16–230:3, Doc. 38-3, at 55–56).

At a staff meeting on January 30, 2006, Smolko reassigned work vehicles to the LEOs.  (EEO Compl. ¶ 34, Doc. 38-8, at 23).  After being offered a choice between a Malibu and a Grand Am, McCartney got the Malibu, observing: "It appears to me that the males believe that having a Malibu is a big joke.  I guess Wendy gets the joke of a car over the males getting the better cars."  (Id.)

On February 1, 2006, Smolko said the word "fuck" in the workplace. (EEO Compl. ¶ 40, Doc. 38-8, at 24).

### (c) Allegations against Strobert

On August 15, 2005, Strobert was discussing Deputy Commissioner Transue– a female state employee who was fired and then rehired as the Deputy of Special Projects in Philadelphia– after having sent out an email with two attached news articles about Transue.  (EEO Compl. ¶ 13, Doc. 38-8, at 18).  Strobert commented: "I'm gonna get fired and be rehired as a Commissioner.  That's right; I'm not a female.  I can't do that."  (Id.)

On October 7, 2005, Strobert sent an email to various recipients, including McCartney, attached to which was a scan of a 1955 Good Housekeeping Magazine article entitled "The Good Wife's Guide."  (EEO Compl. ¶ 14–15, Doc. 38-8, at 18–19; Doc. 37, ¶ 64b; Doc. 50, ¶ 64b). The one-page article can be characterized as an antiquated perspective on marriage, offering eighteen specific recommendations for how a woman can make her husband happy, concluding "[d]on't ask him questions about his actions or question his judgment or integrity. Remember, he is the master of the house and as such will always exercise his will with fairness and truthfulness.  You have no right to

8

question him" and that "[a] good wife always knows her place." (Oct. 7, 2005 Email Attachment, Doc. 38-8, at 30). Strobert commented: "Wow, what a difference 50 years makes. Hurray for liberation movements." (Oct. 7, 2005 Email, Doc. 38-8, at 29). McCartney interpreted his comment as sarcastic. (Id.)

On December 6, 2005, during a period in which McCartney was on leave because of her car accident, she came into work to drop something off. (EEO Compl. ¶ 18, Doc. 38-8, at 19; Doc. 37, ¶ 64c; Doc. 50, ¶ 64c). While she was there, Strobert told her that he did not invite her to a Christmas party or the farewell party for an Officer Siko because "some of the guys felt uncomfortable" with it, and "the guys didn't want [him] to invite [her]." (Id.) McCartney could not say for sure whether other women were invited. (McCartney Dep. 147:4–10, Doc. 38-2, at 100; id. 196:9–21, Doc. 38-3, at 28; id. 199:5–7, Doc. 38-3, at 31).

During the same office visit, McCartney wrote, Strobert tried to explain "why [Mannion] is the way he is. He referred to [Mannion] as the 'Alpha Male' in describing him. I felt as if this was Sgt. Strobert's way of [telling me] that [Mannion] was attempting to be domineering over me and that I was to be submissive to him." (EEO Compl. ¶ 20, Doc. 38-8, at 20; Doc. 37, ¶ 64d; Doc. 50, ¶ 64d).

On January 8, 2006, McCartney sent Strobert a squad-change request, which she copied to Lt. Martin; the next day, the email came back to her from Strobert as deleted and not read. (EEO Compl. ¶ 21, Doc. 38-8, at 20; Doc. 37, ¶ 64e; Doc. 50, ¶ 64e). On the day that McCartney sent her request, Strobert was transferred to a different barracks. (McCartney Dep. 212:11–15, Doc. 38-3, at 38). By January 9, the day that Strobert deleted the email, he was reassigned to the Lewistown PSP. (Id. 213:3–11, Doc. 38-3, at 39; id. 241:16–20, Doc. 38-

3, at 61).

On January 31, 2006, Strobert returned to visit the Altoona office, and was "out by the secretaries' area telling stories about how 'females are less courteous than males.'" (EEO Compl. ¶ 38, Doc. 38-8, at 24; Doc. 37, ¶ 64f; Doc. 50, ¶ 64f).  McCartney believed that Strobert came back– on four occasions– to the Altoona district office to upset her and harass her by saying things about women within earshot.  (McCartney Dep. Day 2 75:1 to 76:25, 162:21 to 169:15, Doc. 48-6, at 19, 41-43). According to McCartney, Strobert would say he was stopping to use the computer but that Strobert could have used the computer at his state police barracks.  (Id.)

### (d) Allegations against Killion

On January 27, 2006, Killion asked McCartney to say goodbye when leaving the office.  (EEO Compl. ¶ 30, Doc. 38-8, at 22).  Killion sent McCartney an email on January 30, 2006, explaining that his request was in reference to a day the previous week when she had taken personal leave without making it known that she was leaving.  (Id. ¶ 31, Doc. 38-8, at 22–23).  According to Killion, the policy had been "in place for years at the Altoona office and was common courtesy."  (Killion Decl. ¶ 8, Doc. 38-6, at 38).  According to Smolko, clerical staff asked Smolko to encourage LEOs to let clerical staff know when they were coming and going, so he did.  (Smolko Decl. ¶ 10, Doc. 38-5, at 62).  Smolko stated that he was not singling McCartney out.  (Id.)  McCartney acknowledged that Smolko brought up the "say goodbye" policy at an office meeting a few days after her conversation with Killion.  (McCartney Dep. 243:9–19, Doc. 38-3, at 62).  McCartney believed this meeting was meant to cover up the fact that she had been singled out.

### (e) Use of profane language

McCartney also complained about the use of profanity, generally:

> What's up with all the "F" words? Smolko isn't the only one here using such nasty profanity. I'm sitting at my cubicle and all of a sudden I'm hearing the "F" word from somewhere across the squad room. It is my understanding that conduct that has the purpose or effect of creating an offensive work environment is not tolerated. This "F" word has no purpose and is offensive to me. I know I may hear this in the bars, but in the office, personnel should not be intoxicated and act professionally.

(EEO Compl. ¶ 40, Doc. 38-8, at 24). McCartney clarified in her depositions that this profanity was not directed at her on these occasions and were not used in a sexual context. (McCartney Dep. 386:6–17, 387:15–17, Doc. 38-4, at 75, 76).

### (f) Butler's investigation and its outcome

As EEO Liaison, Butler's job was to investigate claims of discrimination and harassment filed by BLCE employees. (Bulter Decl. ¶ 1, Doc. 38-7, at 7). He interviewed people who might have knowledge of the events in question and reviewed relevant documents. (Id.) After completing an investigation, Butler would submit his findings to the Director of the Department EEO Office. (Id.) During the time that Butler was EEO Liaison, the Director was Lt. M.L. Henry. (Id.) Lieutenant Henry was responsible for determining whether any violations of PSP policies regarding discrimination had actually occurred, and he would direct the appropriate response. (Id.)

On February 10, 2006, Butler informed McCartney that he would conduct an investigation into the allegations of her complaint, which he did. (Butler Decl. ¶ 2, Doc. 38-7, at 8; McCartney Dep. 79:23–25, Doc. 38-2, at 48). After the investigation, Butler submitted the information he had gathered to Lt. Henry, Director of the PSP EEO Office. (Butler Decl. ¶ 7, Doc. 38-7, at 9).

Lieutenant Henry concluded that no discrimination or harassment had occurred, but nonetheless made several recommendations based on "inappropriate behavior" that he identified.  (Doc. 38- 7, at 59-60 ¶¶ 3–5).  Butler counseled Smolko and reviewed PSP's sexual-harassment policy with him; Strobert's chain of command counseled him for his conduct.  (Butler Decl. ¶ 8, Doc. 38-7, at 9; Doc. 38-7, at 62–65; Smolko Decl. ¶ 11, Doc. 38-5, at 63).  McCartney recalled Smolko receiving a written reprimand.  (McCartney Dep. 97:21-98:2 (Doc. 48-2)).

McCartney was notified of the outcome of the investigation on April 9, 2006.  (Doc. 37, ¶ 87; Doc. 50, ¶ 87).  She was not satisfied with the outcome and was informed that she could file a complaint with the Pennsylvania Human Resources Commission ("PHRC").  (Doc. 37, ¶ 88; Doc. 50, ¶ 88).

**(3) Car assignments**

LEOs at the Altoona office receive state cars when they transfer there, as did McCartney.  (Doc. 37, ¶¶ 91, 94; Doc. 50, ¶¶ 91, 94).  The cars available are those not already being used by other officers.  (Doc. 37, ¶ 92; Doc. 50, ¶ 92).  McCartney complained that Smolko, as vehicle officer, never offered her a new car.  (Doc. 37, ¶ 89; Doc. 50, ¶ 89).  As recounted above, Smolko did give McCartney a choice between a Malibu and a Grand Am, although McCartney described them as "hand-me-down vehicles that were left over."  (McCartney Dep. 248:7–13, Doc. 38-3, at 64).  Plaintiff stated that "these vehicles were used, dirty, and unkempt and unwanted by the other officers."  (Doc. 50, ¶ 90).

According to the defendants, McCartney did not need a new car because of her limited duty and proximity to the Altoona office.  (Smolko Decl. ¶ 16, Doc. 38-5, at 63–64; Hawk Decl. ¶¶ 6–7, 35, Doc. 38-6, at 11, 17).  According to McCartney's EEO Complaint, Smolko offered

12

Mannion's Taurus– a supervisor's car– to Burns, while she would get Burns' "hand me down joke Malibu." (EEO Compl. ¶ 34, Doc. 38-8, at 23). Hawk stated he offered the Taurus to McCartney, but she declined, saying she was satisfied with the Focus she was driving at the time. (Hawk Decl. ¶ 37, Doc. 38-6, at 18).  "On another occasion," declared Hawk, "a brand new Honda Accord was assigned to the Altoona office and I offered it to Plaintiff; however, Plaintiff stated that she was satisfied with the Focus she was driving."  (Hawk Decl. ¶ 37, Doc. 38-6, at 18).

On October 9, 2008, McCartney asked Bush for a new Sebring and told Bush that the larger car might help her back.  (Doc. 37, ¶ 100; Doc. 50, ¶ 100).  On October 10, Bush responded that the Sebring would be replacing the car that Butler had "cracked up," but that McCartney could have the Monte Carlo, which is a large car and might help her back. (Doc. 37, ¶ 101; Doc. 50, ¶ 101).  On October 29, car assignments were made. McCartney got the Monte Carlo; the Sebring was placed as a "pool car"; and a male officer got McCartney's Focus.  (Email from Wayne A. Bush, Dist. Office Cmdr., to Wendy McCartney et al.  (Oct. 29, 2008, 1:30 pm), Doc. 38-8, at 41).

**(4) Strobert assignment and his visits to the Altoona office**

On or about April 4, 2006, after Strobert transferred to the Lewistown barracks, Smolko assigned a matter to McCartney in which Strobert, as the station commander in Lewistown, was the complainant. (Doc. 37, ¶ 104; Doc. 50, ¶ 104).  McCartney believed that Smolko intended the assignment as retaliation, harassment, and intimidation and said so in an email to Hawk. (Doc. 37, ¶ 107; Doc. 50, ¶ 107; Email from Wendy Macknair to Daniel Hawk (Apr. 4, 2006, 10:18 am), Doc. 38-8, at 44-45).  The only contact with Strobert that this assignment would have required McCartney to make was to send him an email at the end of the

investigation.  (McCartney Dep. 262:8–17, Doc. 38-3, at 77; Email from Daniel Hawk to Wendy Macknair (Apr. 6, 2006, 12:56 pm), Doc. 38-8, at 43).

Strobert made five visits to the Altoona office after his transfer, on January 31, 2006; March 30, 2006; July 25, 2006; November 21, 2006; and December 1, 2008.  (Doc. 37, ¶ 109; Doc. 50, ¶ 109).  On January 31, 2006, Strobert commented that women are less courteous than men. (McCartney Dep. 164:9-22, Doc. 48-6, at 41).  On the December 1, 2008, visit, Strobert said hello to McCartney, but she ignored him.  (McCartney Dep. 335:16–25, 337:1–4, Doc. 38-4, at 34, 36).  She believed that Strobert's returns to the Altoona office after he was reassigned were "just to harass [her] more."  (Id. 75:4–25, Doc. 48-6, at 19).

**(5) Smolko visits the Back Room Saloon**

Smolko assigned McCartney to investigate a bar; the Back Room Saloon.  (Smolko Dep. 60:1–12, May 6, 2010, Doc. 48-4, at 15).  On May 6, 2006, Smolko was the Back Room Saloon, with some trooper friends and their wives when McCartney came into the bar on assignment.  (Doc. 37, ¶ 1110-12; Doc. 50, ¶ 111-112).  Smolko denies knowing that McCartney would enter the bar that night.  (Smolko Decl. ¶ 21, Doc. 38-5, at 65).  Smolko also denies identifying McCartney to anyone.  (Id.)  He did not speak to McCartney while he was at the bar, and he left not long after she arrived. Doc. 37, ¶ 113; Doc. 50, ¶ 113).

McCartney believed that Smolko came to the bar to retaliate against her.  (McCartney Dep. 284:16–25, Doc. 38-3, at 92).  She wrote in her report on that date:

> Let it be noted that during the 05/06/06 investigation EO3 SMOLKO was inside the premises off duty with a group of several male acquaintances.  While he was still inside the premises, I saw EO3 SMOLKO look at me.

14

> Shortly thereafter, I then noticed that the group of males that he was associating with were looking at me in a peculiar, irregular way that made me believe my identity may have been compromised.

(Wendy R. Macknair, Pa. State Police Admin. Investigation Report (May 6, 2006), Doc. 38-8, at 50). McCartney did not hear what Smolko told the people that he was with. (McCartney Dep. 280:3–16, Doc. 38-3, at 88). According to McCartney, Smolko's companions looked directly at her and she could tell by their expressions that she had been identified as an undercover officer. (McCartney Dep. 145:15 to 148:2, Doc. 48-2, at 37; McCartney Dep. Day 2 66:5 to 67:20, Doc. 48-6 at 17). McCartney felt that her safety had been jeopardized. (Id.)

After McCartney complained about Smolko being in the bar, Hawk investigated. (Hawk Decl. ¶ 40, Doc. 38-6, at 18). He spoke with Smolko and two of the three troopers he was with at the bar. (Id.) According to Hawk, the other officers told him that Smolko had not directly identified McCartney in any way, but had said that one of his undercover officers was in the establishment. (Id.)

**(6) Assignment to The Spot**

On May 7, 2006, Smolko assigned McCartney to investigate The Spot in Johnstown to see if the establishment was serving food. (Smolko Dep. ¶ 23, Doc. 38-5, at 65). In order to complete this investigation, McCartney would have had only to enter the establishment and ask for food.[6] (Killion Decl. ¶ 6, Doc. 38-6, at 38). She never completed the assignment or entered The Spot; it was reassigned because of her pregnancy. (Doc. 37, ¶ 122; Doc. 50, ¶ 122).

---

[6] Plaintiff denied, referring to Pl.'s Exh. 37, but Exhibit 37 contains nothing relevant to the assignment in question. (Doc. 50, ¶ 121; Doc. 48-10, at 33–34).

**(7) PHRC complaint**

On May 2, 2006, McCartney filed a complaint with the PHRC. (PHRC Compl., May 2, 2006, Doc. 38-8, at 66).  The complaint named only PSP as a respondent.  (Id.)  The gravamen of the complaint was sexual harassment and discrimination.  (Id. ¶¶ 5–34, Doc. 38-8, at 67–69).  On January 29, 2009, the PHRC issued a letter to McCartney saying that her complaint had been dismissed "because the facts of the case do not establish that probable cause exists to credit the allegations of unlawful discrimination."  (Letter from Homer C. Floyd, Executive Dir., PHRC, to Wendy McCartney (Jan. 29, 2009), Doc. 38-9, at 7).  The PHRC's report of their investigation dealt only with McCartney's claims of sexual harrassment.  (PHRC Findings, Doc. 38-9, at 9, 10–23).

**(8) May 2006 complaint about Killion**

On May 15, 2006, McCartney sent an email to Butler complaining that Killion was treating her differently from men because, she claimed, she was being forced to follow contractual travel times at the end of her shift but Killion and other LEOs were not following the same guidelines. (Doc. 37, ¶ 143; Doc. 50, ¶ 143).  Butler investigated this allegation. (Doc. 37, ¶ 145; Doc. 50, ¶ 145).  He ultimately found no evidence of discrimination, although he did note some "minor individual violations/discrepancies" and counseled the individual officers. (Memorandum Concerning EEO Investigation 38-2206 from Capt. Thomas P. Butler, BLCE, to Director, BLCE (July 23, 2006), Doc. 38-7, at 80, 81–82; Butler Decl. ¶ 14, Doc. 38-7, at 11).

**(9) Continuing use of foul language in the Altoona PSP Office**

McCartney claims that the foul language that she complained about in her February 2006 EEO Complaint never stopped.  (Doc. 37, ¶ 158; Doc. 50, ¶ 158).  She described certain instances of the use of the "F"

16

word, including several on one occasion by Butler.  (Doc. 37, ¶ 159; Doc. 50, ¶ 159).  However, none of the defendants that used this word ever directed or addressed such language to McCartney, and the word was not used in a sexual manner.  (Doc. 37, ¶¶ 161–62; Doc. 50, ¶¶ 161–62).

McCartney has no evidence that foul language was ever used by Hawk, Killion, or Gebhart.  (Doc. 37, ¶ 164; Doc. 50, ¶ 164).  She asserted that Strobert used foul language, but was unable to provide a time, date, or year that it occurred.  (McCartney Dep. 329:19–24, Doc. 38-4, at 29).

**(10) Events in late 2006: Mountain Top, the Ford Focus inspection sticker, the Olive Garden Christmas party**

### (a) Mountain Top assignment

Mountain Top Sportsman Association ("Mt. Top") is a private club. (Doc. 37, ¶ 166; Doc. 50, ¶ 166).  On or about September 22, 2006, McCartney was assigned to investigate Mt. Top.  (Doc. 37, ¶ 168; Doc. 50, ¶ 168).  The parties dispute whether Killion instructed McCartney to perform a Small Games of Chance ("SGOC") audit or a less-intensive "review."  On October 19, 2006, McCartney performed an inspection of Mt. Top but did not perform an SGOC audit.  (Doc. 37, ¶ 175; Doc. 50, ¶ 175).  On November 20, 2006, Killion wrote her a memo asking her to explain her failure to conduct an audit.  (Doc. 37, ¶ 178; Doc. 50, ¶ 178). McCartney states that the stress of this investigation caused her physical illness.  (McCartney Decl., Doc. 50-2, at 20).

### (b) Olive Garden Christmas party

The following month, McCartney, along with the others in the Altoona office, was invited to the Olive Garden for a Christmas party on December 12, 2006.  (McCartney Dep. 200:9–14, Doc. 38-3, at 32; Email from Michelle Stine to Wendy McCartney et al. (Dec. 11, 2006, 2:26 pm),

17

Doc. 38-12, at 31).  Rather than attend the Christmas party, McCartney went with her boyfriend to the Olive Garden parking lot, and took video of the cars that were there so that she could make a complaint that officers were using state cars to go to the party.  (McCartney Dep. 200:9–202:5, Doc. 38-3, at 32–34).

### (c) The expired inspection sticker on McCartney's Focus —and the related complaint

On December 14, 2006, McCartney sent an email to Maj. Charles J. Skurkis ("Skurkis") of the Internal Affairs Division in Harrisburg, complaining that Hawk had driven a car on December 8, 2006 with an expired inspection sticker.  (Doc. 37, ¶ 196; Doc. 50, ¶ 196).  McCartney sent the complaint directly to Skurkis because she feared retaliation. (Email from Wendy R. McCartney, LEO, to Maj. Charles J. Skurkis (Dec. 14, 2006, 9:01 am), Doc. 38-12, at 25).

Captain Willard M. Oliphant, Director of the Internal Affairs Division, responded on December 18, 2006, saying that Hawk's actions were "both reasonable and in conformance with the applicable law."  (Memorandum from Capt. Willard M. Oliphant, Dir. of Internal Affairs Div., to LEO Wendy R. McCartney (Dec. 18, 2006), Doc. 38-12, at 29).  McCartney has no direct evidence that her complaint about Hawk was ever communicated to any of the defendants.  (McCartney Dep. 297:4–10, Doc. 38-4, at 8).

### (d) The complaint about the use of state cars to drive to Olive Garden

On December 18, 2006, McCartney sent an email to Maj. Skurkis complaining about the December 12 use of state cars to go to Olive Garden.  (Doc. 37, ¶ 203; Doc. 50, ¶ 203).  During her deposition, McCartney discussed her motivations for submitting these complaints:

> A. There is a directive . . . that when you become

aware of violations you are to report them. However, these incidents were reported not only for that reason, but I would say more along the lines because I felt like I was backed into a corner like I was trapped with nowhere to go, and I needed some relief.  I needed a way out, and I was doing whatever I could to get them to stop.  I didn't know what else to do.  And that's why I filed the complaints; looking for relief from the stress that I had to go through every day.

Q. And how did you think that filing the complaint about the cars would relate to relieving stress?

A. I was trying to get somebody in upper administration to pay attention to what I was saying, to pay attention to me, to listen to what I was saying and just hear me.  And this was my way.  I just didn't know what other way to do it.  And I figured if they looked into this incident, or even the next incident, that eventually somebody would say hey, there's a pattern here.

(McCartney Dep. 107:11–108:16, Doc. 38-2, at 65–66).

The Olive Garden complaint was forwarded to Maj. John P. Lutz on December 19, 2006.  (Memorandum by Cpl. Noel Ruiz (Dec. 19, 2006), Doc. 38-12, at 39).

### (e) Investigation into McCartney's Olive Garden complaint

On January 4, 2007, Capt. Steven M. Johnson, Director, Operations Division, indicated that a limited investigation into McCartney's Olive Garden complaint would be conducted.  (Email from Capt. Steven M. Johnson, Dir., Operations Div., to Cpl. Noel Ruiz (Jan. 4, 2007, 4:32 pm), Doc. 38-12, at 42).  The matter was formally assigned on February 5, 2007.  (Wendy R. McCartney, Complaint Regarding Olive Garden Conduct on Dec. 12, 2006, Doc. 38-12, at 44).  McCartney submitted a memorandum with her allegations on February 9.  (Memorandum from Wendy R. McCartney, LEO, to Sgt. Wayne E. Bush, Dist. Office Cmdr. (Feb. 9, 2007), Doc. 38-12, at 46).

Sergeant Bush investigated the matter and interviewed several people, determining that the officers varied from their normal driving routes by not more than 4.7 miles to reach the Olive Garden.

(Memorandum from Sgt. Wayne E. Bush, Dist. Office Cmdr., to Maj. John P. Lutz. Dir., BLCE (Mar. 7, 2007), Doc. 38-12, at 49, 53). Based on Bush's investigation, Major Lutz concluded that the LEOs' use of state vehicles to drive to Olive Garden was not a violation of PSP regulations or policy. (Memorandum from Maj. John P. Lutz, Dir., BLCE, to Dir., Bureau of Integrity & Prof'l Standards and Dir., Bureau of Human Res. (Mar. 9, 2007), Doc. 38-12, at 56).

McCartney and the others involved were informed that the actions "did not constitute a violation of Department regulations and the allegations are UNFOUNDED," and that no administrative action would be taken. (Memoranda from Maj. John P. Lutz, Dir., BLCE, to LEO Wendy R. McCartney; EO3 Dennis Smolko; LEO Michael Mirabella; LEO James Coble; and LEO Christopher Burns (Mar. 9, 2007), Doc. 38-12, at 58–62).

### (f) Hawk's complaint about McCartney's Mt. Top investigation

Meanwhile, on December 29, 2006, two weeks before he retired, Hawk submitted a formal complaint about the quality of McCartney's work on the Mt. Top investigation. (Doc. 37, ¶ 181; Doc. 50, ¶ 181). The investigation into Hawk's complaint was assigned to Sgt. John C. Kean ("Kean") on January 3, 2007. (Sgt. Daniel L. Hawk, Complaint Concerning McCartney's Mt. Top Investigation, Doc. 38-10, at 7). During his investigation, Kean interviewed LEO William V. Bell, who recalled a conversation that he overheard between Killion and McCartney: "I didn't specifically hear him tell her to do an audit, but LEO Killion basically stated to her that an audit would be the right thing to do and he was instructing her on how to go about an audit . . . ." (Sgt. John C. Kean, Gen. Investigation Report (Feb. 16, 2007), Doc. 38-10, at 9, 16).

On March 22, 2007, McCartney was given notice of a Pre-

20

disciplinary Conference ("PDC") regarding Hawk's complaint, which informed her that she would be given an opportunity to respond to the allegations in the complaint.  (Memorandum from Capt. Steven M. Johnson, Dir., Operations Div., BLCE, to LEO Wendy R. McCartney (Mar. 22, 2007), Doc. 38-12, at 7).  At the PDC on March 26, McCartney stated that she "believe[d] that she addressed the allegations in [a previous] interview and ha[d] no further information to offer."  (Memorandum from Sgt. Wayne A. Bush, Dist. Office Cmdr., BLCE, to Capt. Steven M. Johnson, Dir., Operations Div., BLCE (Mar. 26, 2007), Doc. 38-12, at 9).

On March 28, 2007, Capt. Johnson sustained the allegations that (1) McCartney failed to obey Killion's direct order to conduct an SGOC audit and (2) McCartney demonstrated incompetence by failing to conduct an SGOC audit.  (Memorandum from Capt. Steven M. Johnson, Dir., Operations Div., BLCE, to Director, BLCE (Mar. 28, 2007), Doc. 38-12, at 11, 11–12).

Major Lutz reviewed Johnson's conclusions and assessed discipline on April 2, 2007, noting as an "aggravating factor" that:

> Throughout this investigation, LEO McCartney displayed what can only be described as a cavalier attitude and a failure to take responsibility for her actions, instead choosing to blame everyone else. Her actions reveal a disregard not just for the excellence we strive for as an agency, but also for the minimum standards we require of every employee.

(Memorandum from Maj. John P. Lutz, Dir., BLCE, to Dir., Bureau of Integrity & Prof'l Standards, and Dir., Bureau of Human Res.  (Apr. 2, 2007), Doc. 38-12, at 17).

On May 31, 2007, McCartney was given a written reprimand, signed by Captain Gebhart, for the Mt. Top matter.  (Doc. 37, ¶ 189; Doc. 50, ¶ 189).  Before March 2007, he had had no contact with McCartney. (Gebhart Decl. ¶¶ 1–2, Aug. 2010, Doc. 38- 8, at 7–8).  After filing a

21

"series of grievances," McCartney reached a settlement with the BLCE and the written reprimand was removed from her official personnel file. (Doc. 37, ¶¶ 191–92; Doc. 50, ¶¶ 191–92).

McCartney believed that Hawk's complaint regarding the Mt. Top investigation was retaliation against her for, among other things, her complaint regarding the misuse of state vehicles at Olive Garden and her complaint about Hawk knowingly driving a vehicle with an expired inspection sticker.  (Doc. 37, ¶ 194; Doc. 50, ¶ 194).  She wrote in her notes that on December 28, 2006– one day before Hawk's complaint– she overheard Hawk "in his office talking on the phone to someone about how I sent a complaint to the Major about the after work Christmas Party. He said that he was told that what the officers did was not a big deal and that they didn't need to worry about it."  (McCartney Notes, Doc. 48-10, at 1).  Hawk denies knowing about McCartney's Olive Garden complaint at the time he filed the complaint against McCartney.  (Hawk Decl. ¶ 23, Doc. 38-6, at 15).

**(11) McCartney's Employee Performance Review**

For part of 2006, Killion was Acting EO3 and directly supervised McCartney and other LEOs; as part of his duties in this role, Killion prepared an Employee Performance Review (EPR) for McCartney, and submitted it to her on December 18, 2006.  (Doc. 37, ¶ 212; Doc. 50, ¶ 212).  His review was negative: he "noted that [McCartney] failed to comprehend and carry out instructions, was deficient in her knowledge of forms, lacked initiative, was unwilling to act as part of a team, and, in short, she [strove] only to meet the minimum standards."  (Killion Decl. ¶ 5, Doc. 38-6, at 38).  Hawk signed off on the EPR.  (Hawk Decl. ¶ 26, Doc. 38-6, at 15).

McCartney believed that this negative EPR was Killion's way of

retaliating against her for her complaint about misuse of state vehicles at the Olive Garden Christmas party.  (McCartney Dep. 137:15–138:9, Doc. 38-2, at 91–92).  On December 29, 2006, McCartney appealed the EPR to Major Lutz.  (Doc. 37, ¶ 221; Doc. 50, ¶ 221).  Lutz decided on January 5, 2007, that the EPR would need to be redone because it "was not completed in accordance with Department Regulations." (Memorandum from Maj. John P. Lutz, Dir., BLCE, to LEO Wendy R. McCartney (Jan. 5, 2007), Doc. 38-12, at 72).

Smolko was assigned the task of preparing a new EPR for McCartney, which he did in the days preceding February 13, 2007. (Smolko Decl. ¶ 25, Doc. 38-5, at 65).  He provided the EPR to Sergeant Bush for his input and approval; Bush returned the EPR to Smolko on February 13, at which point Smolko signed the EPR and delivered it to McCartney that same day.  (Id.)  Smolko's EPR was also negative; his overall rating of her was "Unsatisfactory," and he included explanatory narrative comments:

> L.E.O[.] MCCARTNEY displays a studious knowledge of Department policies and procedures and contractual agreements and stays within the boundaries of these dictates.  The issue of this rating period and the resulting overall rating [lie] directly in unwillingness on her part to apply her knowledge in a fashion that would make her an efficient Officer and a willingness to strive for more than minimum effectiveness and performance.  Her resistance to supervisory oversight, working as a team member, and effectively learning and applying policies and office procedures all [have] contributed to this outcome.  L.E.O[.] MCCARTNEY is noticeably discontented in her current job.  That discontent shows in its effect on her performance and attitude.

(EO3 Dennis J. Smolko, Employee Performance Review of Wendy R. McCartney for Dec. 1, 2005 to Nov. 30, 2006 (Feb. 13, 2007), Doc. 38-5, at 69, 72).

McCartney appealed this EPR as well, "most notably because EO3

23

Smolko didn't supervise [her] during the 2006 calendar year."
(Memorandum from LEO Wendy R. McCartney to Dir., BLCE (Mar. 20,
2007), Doc. 38-12, at 78).  In denying this second appeal, Major Lutz
noted that her first appeal was sustained because "EO3 Killion was an
'Acting' supervisor, and was therefore not trained or qualified" to rate
McCartney.  (Memorandum from Maj. John P. Lutz, Dir., BLCE, to LEO
Wendy R. McCartney (Mar. 29, 2007), Doc. 38- 12, at 80).  As a result,
wrote Major Lutz, "the responsibility of preparing [McCartney's] EPR was
transferred to the only other supervisor in the District office at that time,
EO3 Dennis Smolko." (Id.)  Since Smolko did prepare the EPR—doing
so, according to Major Lutz, "based upon his observations and knowledge
of [her] performance"—Lutz told McCartney that she "cannot have it both
ways," and decided that Smolko's EPR would stand.  (Id.)

McCartney claims that the EPR is evidence that Smolko
discriminated against her based on gender and retaliated against her for
a variety of past behavior, including her submission of the February 2006
EEO Complaint– which included Smolko's photograph and profanity, her
successful appeal of Killion's EPR, and her complaint about the use of
state vehicles to attend the Olive Garden Christmas party.   (Doc. 37, ¶¶
236, 239; Doc. 50, ¶¶ 236, 239; McCartney Dep. 139:13-20, Doc. 48-2, at
35).  She admits, however, that she has no evidence as to how Smolko
evaluated other officers, including male officers, in the Altoona office.
(Doc. 37, ¶ 240; Doc. 50, ¶ 240; McCartney Dep. 156:15-21, Doc. 48-2,
at 39).  McCartney did not see EPRs of male officers but is sure she was
singled out because hers was so disparaging.  (McCartney Dep.  125:7-
23, Doc. 48-6, at 32).

McCartney admits that the negative EPR did not alter her pay,
benefits, or result in a demotion or transfer.  (McCartney Dep. 129:22 to

130:8, Doc. 48-6, at 33).  McCartney stated that the negative EPR did hurt her prospects for promotion and her ability to transfer to the six to eight jobs within the state system for which she applied and interviewed. (Id. 213:19 to 215:16, Doc. 48-6, at 54).[7]

**(12) Contact with PHRC**

According to McCartney, on December 14, 2006 she contacted Sherry Kissner of the PHRC regarding the status of her complaint. (McCartney Dep. 117:3 to 118:16, Doc. 48-6, at 30; McCartney Notes of December 14, 2006, Doc. 48-10, at 25).  McCartney told Kisner that her work environment had not improved since her complaint.  (Id.)  Kissner told McCartney that McCartney could file a second complaint for any continued mistreatment and that if McCartney quit because of mistreatment then McCartney could file a complaint for constructive discharge.  (Id.)

McCartney had a similar conversation with Kissner on March 15, 2007.  (McCartney Notes of March 15, 2007, doc. 48-10 at 27-28). During the second conversation, McCartney expressed a hesitance to add new material to her complaint for fear of delaying its resolution.  (Id.) Kissner reiterated that any subsequent discipline or retaliation should be filed as a separate complaint.  (Id.)  McCartney never filed another PHRC complaint.  (McCartney Dep. 105:22 to 106:4, Doc. 48-2, at 27). McCartney explained her decision not to file a subsequent complaint stating, "if I didn't get satisfaction the first time why would I continue to file 'em through them?"  (Id.)

**(13) Subsequent Inappropriate Language**

---

[7] McCartney sought jobs within the state system to avoid forfeiting her retirement pension.  (McCartney Dep. 214:1-4, Doc. 48-6, at 54).

25

McCartney identified one subsequent instance (beyond the time-frame of the EEO complaint) in which Smolko made a comment in her presence that was gender- or sexually inappropriate:

> A. Then we have of course the time that he [came] out of the office yelling f'ing Barney . . . [H]e blatantly just screamed it right in my ear practically
> . . . .
> Q. Did he direct that at you or did he just say it out loud?
> A. He said it out loud, of course. But I felt as if it was being directed at me.

(McCartney Dep. 233:8–20, Doc. 38-3, at 57).  Smolko identified the date as April 2008.  (Smolko Decl. ¶ 11, Doc. 38-5, at 63).  McCartney had recorded it as Tuesday, April 15, 2008, at 3:15 pm.  (McCartney Dep. 250:6–14, Doc. 38-3, at 66).  She noted that it initially sounded as though he were talking to Mirabella, another LEO.  (Id. 250:19–25).  McCartney also felt, however, "that absolutely without question was directed at me from the way he came out of his office it's almost like he had his chest puffed up, and he was just right above me, and he yelled.  Like right at me.  Right through me, just so, I absolutely believe that that was directed at me.  That was his way of saying that I didn't stop him with the [February 9, 2006] complaint that he could still do whatever it was he wanted, and he was, I think it was like retaliation."  (McCartney Dep. 71:11 to 72:2, Doc. 48-6, at 18).

Smolko apologized to McCartney for his comment.  (McCartney Dep. 130:11–16, Doc. 38-2, at 86; Smolko Decl. ¶ 11, Doc. 38-5, at 63).  Concerning Smolko's apology, McCartney opined: "I think it was a show.  He did that because he just wanted to be able to show me that he could still do whatever it was that he wanted to do.  And as long as he apologized, he thought it was okay."  (McCartney Dep. 233:24–234:3, Doc. 38-3, at 57–58).  She made no formal complaint to the Department

regarding Smolko's comment.  (Doc. 37, ¶ 55; Doc. 50, ¶ 55).  At the time that McCartney was deposed, she could recall no instance of Smolko using profanity after the February 2006 EEO complaint, other than the one instance on April 15, 2008.  (McCartney Dep. 251:13–252:7, Doc. 38-3, at 67–68).  However, she did say: "I believe that there were other times that he had" used offensive language, but couldn't recall specific dates or times or words.  (Id. 131:13–20, Doc. 38-2, at 87).  She also testified that LEO Jeffrey Butler used the "F" word frequently, although he did not say it to her; as far as she knew, Smolko never reprimanded him for cursing.  (Id. 191:3–192:13, Doc. 48-6, at 48).

**(14) Retirement**

McCartney retired from the BLCE on December 26, 2008.  (Employment Separation Memorandum of Dec. 16, 2008, Doc. 38-5, at 7).  McCartney's retirement was related to her disability.  (Doc. 37, ¶ 1; Doc. 50, ¶ 1; McCartney Dep. 16:15–20, Doc. 38-2, at 16).

**(B) Procedural history**

McCartney filed her complaint (Doc. 1) on September 21, 2009 and the case was assigned to Judge Christopher C. Conner.  Defendants filed a partial motion to dismiss on November 25, 2009.  (Doc. 7).  The Court granted this motion on May 27, 2010, also granting plaintiff leave to file an amended complaint to cure the defects of the original, except as to her claims of age discrimination and for violation of the PHRA against the PSP, which the Court concluded would be futile.  (Doc. 21).  Plaintiff filed an amended complaint (Doc. 25) on June 16, 2010.  Count I is brought via 42 U.S.C. § 1983 against the individual officers and claims gender discrimination under the Equal Protection clause of the Fourteenth Amendment and retaliation under the First Amendment.  (Am. Compl. ¶¶ 43-48).  Count II is brought under Title VII against the Pennsylvania State

Police and claims gender discrimination and retaliation.  (Id. ¶¶ 49-54).
Unlike the original complaint, the amended complaint did not name
Jeffrey Miller as a defendant.  Defendants answered on July 15, 2010.
(Doc. 28).

On July 20, 2010, Defendant Mannion filed a motion for judgment
on the pleadings.  (Doc. 29).  That day the plaintiff requested voluntary
dismissal with prejudice of those same claims.  (Doc. 31).  On July 28,
2010, the Court granted the voluntary dismissal that plaintiff requested
and denied Mannion's motion as moot.  (Doc. 33).

On September 1, 2010, defendants filed their motion for summary
judgment.  (Doc. 36).  On March 9, 2011 Magistrate Judge William T.
Prince filed a report and recommendation proposing that the defendants'
motion for summary judgment be granted and that the complaint be
dismissed.  (Doc. 57).  On March 23, 2011 this case was reassigned from
Judge Conner to the undersigned judge.  (Doc. 59).  Plaintiff has filed her
objections to the report and recommendation and these objections have
been briefed, bringing the case to its present posture.

**JURISDICTION**

Because this case is brought under Title VII, Section 1983, and the
First and Fourteenth Amendments, the court has federal question
jurisdiction pursuant to 28 U.S.C. § 1331.  ("The district courts shall have
original jurisdiction of all civil actions arising under the Constitution, laws,
or treaties of the United States.").

**LEGAL STANDARD**

In disposing of objections to a magistrate judge's report and
recommendation, we make a *de novo* determination of those portions of
the report to which objections are made.  28 U.S.C. § 636 (b)(1)(C); see
also Henderson v. Carlson, 812 F.2d 874, 877 (3d Cir. 1987).  This court

may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  We may also receive further evidence or recommit the matter to the magistrate judge with instructions.  Id.

Before the court is the magistrate judge's recommendation that we grant the defendants' motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  The granting of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

When considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion.  Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's

29

burden of proof at trial.  Celotex v. Catrett, 477 U.S. 317, 322 (1986).

Once the moving party satisfies its burden, the burden shifts to the non-

moving party, who must go beyond its pleadings, and designate specific

facts by the use of affidavits, depositions, admissions, or answers to

interrogatories showing that there is a genuine issue for trial.  Id. at 324.

**DISCUSSION**

The defendants move for summary judgment on all of McCartney's

claims.  Magistrate Judge Prince recommends that the motion be

granted.  McCartney filed the following objections:

> 1) as stated, the magistrate clearly exceeded the summary judgment standard of review; 2) plaintiff has set forth facts sufficient to permit her Title VII discrimination and retaliation claims to go to a jury. . . ; 3) plaintiff's retaliation claim was sufficiently within her administrative discrimination claims such that her remedies are exhausted. . . ; 4) plaintiff has stated a First Amendment claim; and 5) defendants are clearly not entitled to qualified immunity.

(Pl. Br. Supp. Objs. at 1-2 (Doc. 62)).  McCartney's first objection– that

the magistrate judge did not apply the correct legal standard for summary

judgment– will not be addressed independently, as it is subsumed within

our analysis of the merits of each claim.  We will address the remaining

objections in logical order.

**A. Whether Plaintiff Exhausted Claim for Retaliation Under Title VII**

McCartney's third objection, which we address first, is that she

exhausted a claim for retaliation under Title VII.  "It is . . . established

doctrine that a charge must be filed against a party with the EEOC before

an action in the district court can be commenced."  Glus v. G. C. Murphy

Co., 562 F.2d 880, 885 (3d Cir. 1977).  "In the case of an employer other

than the federal government, a complaint must first be filed with the state

agency charged with enforcing the laws against employment

discrimination, if one exists."  Waiters v. Parsons, 729 F.2d 233, 237 n.8

(3d Cir. 1984) (citing 42 U.S.C. § 2000e-5(c), (d)).  Here, McCartney filed a complaint with the Pennsylvania Human Relations Commission ("PHRC"), the state agency that enforces employment discrimination law, and then filed a complaint in the federal court within the two-year statute of limitations.

"Courts have generally determined that the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination . . . including new acts which occurred during the pendency of proceedings before the Commission[.]"  Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976) (internal citations omitted).

Judge Prince found that McCartney had exhausted her administrative remedies by filing a complaint with the PHRC on May 2, 2006, as a prerequisite to filing her Title VII claim.  Judge Prince also found, however, that the PHRC complaint only alleged claims of discrimination based on gender– disparate treatment and hostile work environment– and that the complaint could not fairly be read to allege a claim of retaliation.

McCartney objects that she did complain about retaliation to the PHRC.[8]  She also argues that her retaliation claim was part of the "core

---

[8] McCartney, in her counterstatement of material facts, states that: "Retaliation was brought to the PHRC's attention.  See *IN-15 Form Harassment Questionnaire signed and dated March 22, 2006, pages 1-3*." (CSMF ¶ 132).  McCartney does not cite to a document number or exhibit number and a review of the exhibits failed to uncover this document.  See FED. R. CIV. P. 56(e)(2) (allowing a court to consider a fact undisputed if the attempted controversion is not properly supported); L.R. 56.1 ("Statements of material facts in support of, or in opposition to, a motion shall include

grievance" of gender discrimination / hostile work environment because the conduct underlying each claim is the same.  She argues that her retaliation claim would have arisen in the course of a "responsible EEOC investigation."

As it is clear that McCartney's PHRC complaint makes no specific reference to retaliation, we must determine whether a claim of retaliation would have grown from a reasonable EEOC investigation, including acts between the PHRC complaint's filing and the investigation's completion. We find that there is no genuine issue of material fact as to whether a reasonable investigation into McCartney's May 2, 2006 PHRC complaint of discrimination would have found that the subsequent December 18, 2006 or February 13, 2007 EPRs were retaliation.  The investigation, reasonably, focused on the subject of McCartney's complaint–discrimination.  No facts alleged in the complaint indicated retaliation. McCartney has not otherwise shown how the PHRC's investigation was unreasonable.  Additionally, on December 14, 2006 and March 15, 2007 Human Resources Representative Sherry Kissner told McCartney that she could file a PHRC complaint alleging retaliation if McCartney was disciplined.  McCartney stated that she never complained of retaliation to the PHRC because she was not satisfied with the resolution of her first complaint.  That may be a valid personal reason not to file a subsequent complaint but is not a sufficient legal justification to excuse exhaustion. Accordingly, summary judgment will be granted on McCartney's claim of retaliation.

**B. Gender Discrimination Under Title VII and Equal Protection**

McCartney's second objection is that she adequately plead a

---

references to the parts of the record that support the statements.").

discrimination claim under Title VII.  We will address McCartney's claims under Title VII and the Equal Protection Clause jointly, as did Judge Prince.  See Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir. 1997)) (noting that a Title VII discrimination analysis is applicable to a discrimination claim under the Equal Protection Clause).  Under Title VII, "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  McCartney claims gender discrimination violations under theories of (1) disparate treatment and (2) hostile work environment leading to constructive discharge.  We will address these theories in order.

### 1. Disparate Treatment

Absent direct evidence of discrimination, discrimination claims under Title VII are subjected to the burden shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000).  Under this framework, the plaintiff must first establish her prima facie case by a preponderance of the evidence, which creates a presumption of discrimination.  St. Mary's Honor Ctr v. Hicks, 509 U.S. 502, 506 (1993).  The burden then shifts to the employer, who must "articulate some legitimate, nondiscriminatory reason for the employee's rejection," thereby rebutting the presumption of discrimination.  McDonnell Douglas, 411 U.S. at 802; Texas Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981); Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997).  To succeed on her claim, the plaintiff must then show, by a preponderance

of the evidence, that the employer's given reasons were a pretext for discrimination.  <u>Burdine</u>, 450 U.S. at 253; <u>Woodson</u>, 109 F.3d at 920.

In order to prove a prima facie case of disparate treatment under Title VII, the plaintiff must show that: 1) he is a member of a protected class; 2) he was qualified for the position; 3) he was subjected to an adverse employment action; and 4) the circumstances of the adverse action imply discrimination.  <u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003).  Judge Prince found that the first two elements of the prima facie case of disparate treatment under Title VII were satisfied– McCartney, as a woman, is a member of a protected class and was qualified for her position.  The report and recommendation found, however, that McCartney was not subjected to an adverse employment action because the instances of which she complained did not significantly impact her employment status.  With respect to the final element of McCartney's prima facie case, Judge Prince found that none of the alleged adverse employment actions were taken under circumstances suggesting discrimination.

Addressing the third element, "[i]n order to be entitled to relief, a plaintiff must have suffered a cognizable injury.  Thus, only a person 'claiming to be aggrieved' may bring an action under Title VII. [The Third Circuit has] defined 'an adverse employment action' under Title VII as an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'"  <u>Storey v. Burns Int'l Sec. Servs.</u>, 390 F.3d 760, 764 (3d Cir. 2004) (citations omitted).  McCartney argues that her February 13, 2007 EPR was an adverse employment action.  She further argues that the negative evaluation "actually kept plaintiff from other positions, and deprived her opportunities for advancement[.]"  (Doc. 62 at 8).  For the

34

purpose of this analysis, we assume that the EPR altered McCartney's terms and conditions of employment.

The fourth element requires that the plaintiff show that the circumstances of the adverse action imply discrimination. "The evidence most often used to establish this nexus is that of disparate treatment, whereby a plaintiff shows that she was treated less favorably than similarly situated employees who are not in plaintiff's protected class." Doe v. C.A.R.S. Prot. Plus, 527 F.3d 358, 366 (3d Cir. 2008) (citing Iadimarco v. Runyon, 190 F.3d 151, 162 (3d Cir. 1999).

The defendants argue that the circumstances do not suggest discrimination. McCartney has not shown that similarly situated men were treated differently. Specifically, McCartney has not presented evidence as to how Killion or Smolko evaluated male officers. We agree. McCartney's declaration does list incidents where male BLCE officers allegedly violated policies or made mistakes. (See Pl.'s Ex. 30 (Doc. 48-9 at 42-47) (describing late, incomplete, and inaccurate special reports of male officers); Pl.'s Ex. 28 (Doc. 48-9 at 28-37) (cataloging incidents where male officers conducted personal business during work hours)). Taking those allegations for what they are worth, McCartney has failed to go the next step– showing that supervisors were aware of those deficiencies and did not give EPRs that were as harsh as those given to her. At this stage of the litigation, it is insufficient to generally claim in an unsworn declaration that others have not been scrutinized as closely. To survive a motion for summary judgment, the plaintiff must present a genuine issue of material fact that others similarly situated were treated differently. Specifically, McCartney has presented no EPRs of similarly situated male colleagues. Accordingly, we determine that McCartney has not presented a genuine issue of material fact from which a reasonable

jury could conclude that she was treated differently from similarly situated male employees.  As McCartney has not satisfied her burden of establishing a prima facie case of disparate treatment, we need not examine the remaining steps of the McDonnell Douglas framework. Thus, the defendants' motion for summary judgment will be granted with respect to McCartney's claims for gender discrimination based on disparate treatment under Title VII and the Equal Protection clause of the Fourteenth Amendment.

### 2. Hostile Work Environment

Another means of proving a violation of Title VII is to show that sexual harassment created a hostile work environment.  Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293 (3d Cir. 1999).  The elements of a hostile work environment claim against an employer are: "(1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability."  Hutson v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009) (citing Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001); Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990)).  In this context, the fifth element– *respondeat superior*– means notice to the employer, not vicarious liability.  Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 n.5 (3d Cir. 1999).

To establish a hostile work environment claim, "the offending behavior 'must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Pennsylvania State Police v. Suders, 542 U.S. 129, 146-47 (2004)

36

(quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).
However, "[t]o make out a case under Title VII it is only necessary to
show that gender is a substantial factor in the discrimination, and that if
the plaintiff had been a man she would not have been treated in the same
manner.  To constitute impermissible discrimination, the offensive
conduct is not necessarily required to include sexual overtones in every
instance or that each incident be sufficiently severe to detrimentally affect
a female employee." Andrews v. Philadelphia, 895 F.2d 1469, 1485 (3d
Cir. 1990) (internal quotations and citations omitted).  "'[W]hether an
environment is "hostile" or "abusive" can be determined only by looking at
the circumstances.  These may include the frequency of the
discriminatory conduct; its severity; whether it is physically threatening or
humiliating, or a mere offensive utterance; and whether it unreasonably
interferes with an employee's work performance.'" Aman v. Cort
Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996) (quoting Harris
v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993)).

Finally, "[a] hostile-environment constructive discharge claim entails
something more: A plaintiff who advances such a compound claim must
show working conditions so intolerable that a reasonable person would
have felt compelled to resign." Suders, 542 U.S. at 147.  Thus,
"[c]onstructive discharge exists if 'the conduct complained of would have
the foreseeable result that working conditions would be so unpleasant or
difficult that a reasonable person in the employee's shoes would resign.'"
Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 (3d Cir. 1999) (citing
Goss v. Exxon Off. Sys. Co., 747 F.2d 885, 887-88 (3d Cir. 1984)).

Judge Prince found that McCartney failed to establish a genuine
issue of material fact as to whether she was subjected to a hostile work
environment.  The magistrate judge found that McCartney satisfied the

37

first element of the claim– intentional discrimination because of her gender.  Judge Prince was not satisfied, however, that the discrimination was pervasive.  Judge Prince was also not satisfied that the discrimination detrimentally effected McCartney or that a reasonable person in McCartney's position would have been detrimentally effected. Finally, the magistrate judge found that McCartney could not establish a claim for constructive discharge because the conditions of McCartney's employment were not so severe that resignation was a fitting response.

We agree with Judge Prince that a reasonable jury could find that McCartney had been intentionally discriminated against because of her gender.[9]  We also agree, however, that McCartney has not presented a genuine issue of material fact as to whether the assumed discrimination was pervasive and regular.  Ignoring, as did Magistrate Judge Prince, the gender-neutral workplace incidents which predominate McCartney's allegations, we cannot conclude McCartney's work environment was hostile or abusive.

As Judge Prince found:

> some of the conduct by Smolko and Strobert described in the February 2006 EEO complaint does have clear overtones of sex or gender and betrays a possible discriminatory animus. ] Smolko's photograph of a man in a penis costume, his reference to women as "girls," and his description of the Altoona barracks as a "big male dormitory" where farting "occurred" all constitute conduct in which gender is a "substantial factor," and suggest that if plaintiff "had been a man," she may have been treated differently.  Likewise with the [Transue article and Good Housekeeping article] that Strobert emailed; these articles, combined with his commentary, could have a disproportionately negative psychological or emotional impact on a woman as opposed to a man.

---

[9] The defendants raised no objection to this finding.

(Report & Recommendation at 49).  These five instances all occurred between August of 2005 and January 2006.  We also consider McCartney's allegation that Strobert visited the Altoona district on January 31, 2006 and made comments to the effect that women are not courteous.

Thus, reading the record in a light most favorable to McCartney, there are approximately six instances of intentional gender discrimination between the middle of 2005 and early 2006.  We cannot, as a matter of law, conclude that these alleged instances– averaging approximately one instance per month for a six month period– were infrequent.  However, none of the alleged instances of discrimination can be considered severe.  Rather, each alleged instance amounts to an  offensive utterance.  Also, none of the instances were physically threatening or physically humiliating.  Thus, considering McCartney's plausible allegations of gender discrimination, we determine that there is no genuine issue of material fact as to whether McCartney faced regular and pervasive discrimination.  We do so evaluating the instances in the totality, and not individually.

Having determined that the discrimination was not pervasive and regular, we have no occasion to address whether McCartney was detrimentally effected by the discrimination or whether a reasonable person in McCartney's position would have been detrimentally effected.[10]  Accordingly, the defendants' motion for summary judgment on McCartney's hostile work environment claims under Title VII and the

---

[10] The defendants do not dispute that respondeat liability is satisfied here.  PSP was on notice that McCartney felt discriminated against, based on her internal complaints and the EPR noting she was unhappy in her position.

Equal Protection clause of the Fourteenth Amendment will be granted. We also necessarily conclude that McCartney cannot prevail on a claim of constructive discharge, as that claim is predicated on intolerable working conditions, which McCartney– as described with respect to her underlying claim for hostile work environment– cannot show.

## C. First Amendment Claim

McCartney's fourth objection is that she made out a section 1983 claim for retaliation under the First Amendment.  Section 1983 does not, by its own terms, create substantive rights.  Rather, it provides remedies for deprivations of rights established elsewhere in the Constitution or federal law.  United States v. Kneipp, 95 F.3d 1199, 1204 (3d Cir. 1996). In pertinent part, section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Thus, to establish a claim under section 1983, two criteria must be met.  First, the conduct complained of must have been committed by a person acting under color of state law.  Second, the conduct must deprive the plaintiff of rights secured under the Constitution or federal law.  Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 590 (3d Cir. 1998).

McCartney claims she was terminated in retaliation for engaging in activity protected under the First Amendment.  The Third Circuit has adopted the three-step test to evaluate a public employee's claim of retaliation for engaging in activity protected under the First Amendment. See Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005).  First, the

employee must show that his activity is protected.  Id. (citing Pickering v. Bd. of Educ., 391 U.S. 563 (1968)); Green v. Phila. Hous. Auth., 105 F.3d 882, 885 (3d Cir. 1997).  "Second, the employee must show that the protected activity 'was a substantial factor in the alleged retaliatory action.'"  Hill, 411 F.3d at 125 (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  "Third, the employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct." Id. at 125.  See also Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001).

    We first address whether Plaintiff's speech is protected under the First Amendment.  A public employee has a First Amendment right, "in certain circumstances, to speak as a citizen addressing matters of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).  Under Garcetti, we must first determine whether plaintiff's statements were made "as a citizen upon matters of public concern."  Id. at 416 (quoting Connick v. Myers, 461 U.S. 138, 147 (1983)).  "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421.  With respect to the public-concern requirement, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  Connick, 461 U.S. at 147-48.  "The content of speech on a matter of public concern generally addresses a social or political concern of the community."  Borden v. Sch. Dist. of E. Brunswick, 523 F.3d 153, 169-70 (3d Cir. 2008).  Though fact-sensitive, "the inquiry into the protected status of speech is one of law,

41

not fact." <u>Connick</u>, 461 U.S. at 148 n.7.

If we find that the plaintiff did speak as a citizen on a matter of public concern, we must engage in the balancing test established in <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568 (1968). In <u>Pickering</u>, the Court explained its objective of balancing "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." <u>Id.</u> at 568. As such, we must determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." <u>Garcetti</u>, 547 U.S. at 418.

Judge Prince found, preliminarily, that a two year statute of limitations governs McCartney's claim under § 1983, therefore she may not recover for acts before September 21, 2007.[11] We agree. Analyzing the merits of McCartney's retaliation claim, Judge Prince found that McCartney's speech– (1) her 2006 EEOC / PHRC complaint; (2) her inspection sticker complaint; and (3) her Olive Garden complaint– were not matters of public concern. Even if McCartney had spoken on a matter of public concern, the magistrate judge found that the alleged acts of retaliation would not have deterred a person of ordinary firmness from speaking. Judge Prince also found that the alleged retaliation was not causally connected to the speech. Thus, Magistrate Judge Prince recommends granting summary judgment on McCartney's claims for First

---

[11] "Actions brought under 42 U.S.C. § 1983 are governed by the personal injury statute of limitations of the state in which the cause of action accrued." <u>O'Connor v. City of Newark</u>, 440 F.3d 125, 126 (3d Cir. 2006) (citing <u>Cito v. Bridgewater Twp. Police Dep't</u>, 892 F.2d 23, 25 (3d Cir. 1989)).

Amendment retaliation.

We agree with Judge Prince there is no genuine issue of material fact as to whether McCartney spoke on a matter of public concern.  Her discrimination complaint related to her own employment.  Her other instances of speech involved reporting on violations of agency policies or laws.  The record shows that McCartney made these complaints (1) pursuant to her own duties and (2) in order to find an outlet for her own perceived mistreatment by her colleagues.  (See McCartney Dep. 107:11–108:16, Doc. 38-2, at 65–66 ("There is a directive . . . that when you become aware of violations you are to report them. . . .  I was trying to get somebody in upper administration to pay attention to what I was saying, to pay attention to me[.]")).  These are plainly not public topics that implicate the political process or social concerns.  Thus, we find as a matter of law that McCartney's speech was not on a matter of public concern.  Accordingly, McCartney cannot establish a violation of her first amendment rights and we decline to address the remaining elements of this cause of action.  The defendants' motion for summary judgment will be granted on this claim.

## D. Qualified Immunity

Defendants contend they are entitled to summary judgment on Plaintiff's claims because they are shielded from liability by the doctrine of qualified immunity.  Qualified immunity protects public officials "'from undue interference with their duties and from potentially disabling threats of liability.'"  Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005) (quoting Elder v. Holloway, 510 U.S. 510, 514 (1994)).  The doctrine does not apply when state officials "violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Id. at 599-600 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 806

43

(1982)).  Therefore, the court must examine: (1) whether the officials violated a constitutional right, and (2) whether that right was clearly established at the time.  Id.

As we have determined, above, McCartney has not presented genuine issues of material fact with respect to her claim for gender discrimination under the Equal Protection Clause of the Fourteenth Amendment or with respect to her claim for retaliation under the First Amendment.  Accordingly, the defendants' motion for summary judgment is moot with respect to qualified immunity.

**CONCLUSION**

For the reasons stated above, the defendants' motion for summary judgment will be granted and the plaintiff's claims dismissed.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

WENDY McCARTNEY,      :     No. 1:09cv1817
      Plaintiff        :
       v.            :     (Judge Munley)
                      :
PENNSYLVANIA STATE    :
POLICE, DANIEL HAWK,  :
DENNIS SMOLKO, EARL   :
KILLION, CHARLES      :
STROBERT, THOMAS      :
BUTLER, PATRICK       :
GEBHART,              :
      Defendants       :

## ORDER

**AND NOW**, to wit, this  29th  day of July 2011, upon consideration of the plaintiff's objections to the magistrate judge's report and recommendation which proposes that the defendants' motion for summary judgment be granted and that the plaintiff's complaint be dismissed, it is HEREBY **ORDERED** that:

•     The objections (Doc. 61) to the report and recommendation are **OVERRULED**,

•     The report and recommendation (Doc. 57) is **ADOPTED**,

•     The motion for summary judgment (Doc. 36) is **GRANTED**.

The Clerk of Court is directed to **CLOSE** this case.

            **BY THE COURT:**

             s/ James M. Munley

            **JUDGE JAMES M. MUNLEY**
            **United States District Court**